FORTUNE ODEND'HAL, JR., AND GLORIA P. ODEND'HAL, ET AL.,[1] PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8553–78, 8554–78, 3066–79, 5780–79, 2275–80, 2446–80, 2627–80, 6107–80, 6108–80, 6228–80.  Filed March 28, 1983.

---

[1]Cases of the following petitioners are consolidated herewith: Fortune Odend'hal, Jr., docket No. 8554–78; William J. Cassidy and Clotilda G. Cassidy, docket No. 3066–79; Fortune Odend'hal, Jr., docket No. 5780–79; Dean L. Mann and Beverly D. Mann, docket No. 2275–80; Ivan V. Magal and Leah R. Magal, docket No. 2446–80; Larry M. Stanton and Esther M. Stanton, docket No. 2627–80; Robert M. Allen and Frances D. Allen, docket No. 6107–80; Charles C. Yu and Marie S. Yu, docket No. 6108–80; and Fortune Odend'hal, Jr., docket No. 6228–80.

*Scott P. Crampton* and *James Dewey O'Brien*, for the petitioners.

*Carolyn Parr*, for the respondent.

## OPINION

NIMS, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax in these consolidated cases:

| Docket No. | Petitioner(s) | Year | Deficiency | Sec. 6651(a)[2] addition to tax |
|---|---|---|---|---|
| 8553–78 | Fortune Odend'hal, Jr., Gloria P. Odend'hal | 1973 | $42,709.00 | 0 |
| 8554–78 | Fortune Odend'hal, Jr. | 1974 | 45,086.00 | 0 |
| 3066–79 | William J. Cassidy and Clotilda G. Cassidy | 1973 | 32,918.00 | $6,221.00 |
| | | 1974 | 32,950.00 | 0 |
| | | 1975 | 9,540.00 | 0 |
| 5780–79 | Fortune Odend'hal, Jr. | 1975 | 37,374.00 | 5,606.00 |
| 2275–80 | Dean L. Mann and Beverly D. Mann | 1975 | 17,722.00 | 0 |
| | | 1976 | 22,307.00 | 0 |
| 2446–80 | Ivan V. Magal and Leah R. Magal | 1975 | 10,652.00 | 0 |
| | | 1976 | 14,885.00 | 0 |
| 2627–80 | Larry M. Stanton and Esther M. Stanton | 1975 | 16,395.00 | 0 |
| | | 1976 | 20,757.00 | 0 |
| | | 1977 | 22,991.00 | 0 |
| 6107–80 | Robert M. Allen Frances D. Allen | 1975 | 21,277.00 | 0 |
| | | 1976 | 22,677.00 | 0 |
| | | 1977 | 19,436.00 | 0 |
| 6108–80 | Charles C. Yu and Marie S. Yu | 1975 | 20,796.00 | 0 |
| | | 1976 | 17,488.00 | 0 |
| | | 1977 | 19,470.12 | 0 |
| 6228–80 | Fortune Odend'hal, Jr. | 1976 | 35,361.00 | 7,072.20 |

---

[2]All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

The following issues remain for our decision after concessions by the parties: (1) Whether petitioners are entitled to depreciation, rental, and interest deductions associated with their interests in a warehouse complex located in Cincinnati, Ohio, in an amount greater than the income generated by the property; (2) a determination of the useful life of the depreciable property; (3) whether petitioners Yu, docket No. 6108–80, and Stanton, docket No. 2627–80, must adjust the income as reported during the base period years for income averaging purposes; (4) whether petitioner Odend'hal is liable for section 6651(a) additions to tax in docket Nos. 5780–79 and 6228–80; and (5) whether petitioners are entitled to attorneys' fees.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations and attached exhibits are incorporated herein by reference.

Petitioners resided in the following areas when they filed their petitions in these cases:

| *Petitioner* | *Residence* |
|---|---|
| Odend'hal | Virginia |
| Cassidy | Virginia |
| Allen | Virginia |
| Yu | Virginia |
| Mann | Maryland |
| Magal | Maryland |
| Stanton | District of Columbia |

## I. KROGER PROPERTY ISSUES

The primary issues in this case concern petitioners' participation in a real estate venture. The real estate consists of 10 buildings located on 5.8 acres of land in Cincinnati, Ohio (the property). The Kroger Co. (Kroger) occupies the property and uses it to prepare products for distribution to its chain of supermarkets. The property has ready access to interstate highways and has its own railroad siding.

The buildings were constructed between 1926 and 1949. The buildings contain an area in excess of 700,000 square feet. The buildings have been well maintained. They continue to provide adequate facilities for warehousing and processing.

Several transactions involving the property which occurred prior to petitioners' 1972 acquisition are important in this case. Accordingly, we make findings regarding these transactions before our findings regarding petitioners' acquisition.

## The Kroger Sale to Union Central

Kroger owned the land and the buildings until 1951. On July 1, 1951, Kroger sold the property under a sale-leaseback arrangement to the Union Central Life Insurance Co. (Union Central) for $5 million. Union Central paid the $5 million in cash.

Union Central leased the land and buildings back to Kroger (the Kroger Lease) for 25 years for an annual rental of $325,200. This rental provided a 4.5-percent yield and a complete return of Union Central's investment over the 25-year primary term of the lease. The rental was payable in monthly increments of $27,100.

The agreement also gave Kroger four renewal options, each for a 5-year period. Rentals for the first two renewals were $100,000 per year, payable at $8,333.33 a month. Rentals for the last two renewals were $75,000 per year payable at $6,250 a month. Thus, Union Central's right to repossession of the property would be postponed until July 1996.

The lease was a net-net-net lease. Kroger had responsibility for taxes, insurance, utilities, and maintenance for the property for the primary term and for each of the renewal periods.

Union Central's deed to the property and the Kroger Lease were recorded during July 1951.

On November 29, 1956, Union Central sold a small unimproved piece of the property to Gromarco, Inc., a Kroger subsidiary, for $3,000. The Kroger Lease was amended at that time to reduce the annual rental from $325,200 to $325,016.52 in order to compensate for the sale of the small parcel. The monthly rental, therefore, became $27,084.71.

## The Union Central Sale to Fairchild

Union Central transferred the land and buildings to Charles M. Fairchild (Fairchild) by deed dated April 1, 1967, and recorded April 18, 1967. The Kroger Lease, of course, remained on the property.

Consideration for the transfer totaled $2,670,000. Fairchild paid $115,000 cash. Fairchild got the cash from Georgetown University. In return for the cash, Fairchild promised Georgetown a share of any profits he might make on sale of the

property. This joint venture between Fairchild and Georgetown University was called Fairtown.

Fairchild also signed a $2,555,000 nonrecourse promissory note. Union Central took a purchase-money mortgage on the property (the first mortgage) and a security interest in the property's leases and rents to secure the $2,555,000 principal and interest obligation. The first mortgage and the assignment of leases and rents were recorded on April 20, 1967.

The nonrecourse note was payable as follows: (1) $25,618.37 per month from May 1967 through June 1976—this amount included a 5¼-percent interest rate; (2) $4,957.24 per month from July 1976 through June 1986—this amount included a 7-percent interest rate; and (3) a balloon payment of $98,720.31 on July 1, 1986.

Union Central calculated the $2,670,000 sales price based on an estimate of the value of the income to be generated by the property plus an estimate of the value of its future possessory interest.

## *The Fairchild Sale to the Burwell Group*

Fairchild, in turn, transferred the land and buildings to Bruce E. Roberts (Roberts), Nathan B. Butcher (Butcher), and Lewis C. Burwell (Burwell) (who will be referred to collectively as the Burwell group) by deed dated May 1, 1967, and recorded August 2, 1967. The Burwell group's interest also was subject to the Kroger Lease.

Consideration for the transfer totaled $5 million. The Burwell group paid $100,000 cash. They also took the property "subject to" the first mortgage which secured Fairchild's $2,555,000 nonrecourse note.

In addition, the Burwell group signed ten $233,000 nonrecourse promissory notes (the Burwell notes). Fairchild took a purchase-money mortgage on the property (the second mortgage) to secure the $2,330,000 principal and interest obligations of the Burwell notes. The second mortgage was recorded on August 2, 1967. The Burwell group completed the $5 million purchase price by signing an additional $15,000 promissory note.

The $2,330,000 principal amount of the 10 Burwell notes was due in a balloon payment on May 1, 1987. Interest was due

during the 20-year term of the notes, payable 1 year in advance, as follows:

| Period | Rate |
|---|---|
| May 1, 1967 - May 1, 1968 | 5 percent |
| May 1, 1968 - May 1, 1969 | 4 percent |
| May 1, 1969 - May 1, 1970 | 3.1 percent |
| May 1, 1970 - May 1, 1976 | 1.5 percent |
| May 1, 1976 - May 1, 1987 | 3.5 percent |

The Burwell group received rental payments directly from Kroger. In turn, they made the first mortgage payments to Union Central.

On December 20, 1971, Fairchild gave the trustees for the Richmond, Fredericksburg & Potomac Railroad Co. a security interest in 9 of the 10 Burwell notes. These 9 notes totaled $2,097,000. On the same day, Fairchild assigned the 10th Burwell note and a 10-percent interest in the second mortgage to Georgetown University. Fairchild made this latter assignment pursuant to the Fairtown joint venture through which Georgetown provided the $115,000 in cash which Fairchild used as the downpayment for the property.

### The Burwell Group's Sale and Ground Lease to Fairchild's Corporations

In 1973, the Burwell group split their fee interest in the property. They sold the improvements and the Kroger Lease benefits to the Realty Corp. of America (RCA). They leased the ground on a long-term basis to Management Properties, Inc. (MPI). The Burwell group retained the reversion. Fairchild controlled RCA and MPI. We will analyze the terms of these transactions separately.

The Burwell group transferred the improvements and the Kroger Lease benefits to RCA by a deed dated April 30, 1973, and recorded January 21, 1974. Consideration for this transfer totaled about $2,040,000. This consideration was composed of the following elements:

(1) Paying $5,000 cash;

(2) Taking subject to the $1,339,000 balance due under the first mortgage;

(3) Taking subject to $233,000 due under the second mortgage; and

(4) Issuing $463,000 in notes secured by a new third mortgage.

RCA took its interest subject to the $1,339,000 balance associated with the first mortgage as of the May 1, 1973, transfer date.[3] RCA was to receive the Kroger rentals and was to make the first mortgage payments to Union Central.

RCA also took responsibility for performing on the $233,000 Burwell note held by Georgetown University. To this extent, RCA was subject to the second mortgage. The Burwell group, however, promised RCA that RCA would not be subject to the second mortgage to the extent that it secured performance on the other nine Burwell notes (totaling $2,097,000). Apparently, therefore, this side agreement between the Burwell group and RCA imposed an obligation on the Burwell group with reference to payment of the nine notes which the nonrecourse notes themselves did not contain.

Also, Fairchild, as holder of these nine Burwell notes, agreed to extend their due date from May 1, 1987, to May 5, 2002. The interest rate payable during the extension period was 3.5 percent.

To complete the $2,040,000 purchase price, RCA issued three nonrecourse promissory notes to the Burwell group totaling $463,000 (the RCA notes). The RCA notes were dated April 30, 1973. The RCA notes provided that the $463,000 principal was due in a balloon payment on April 30, 2002. However, the RCA notes also provided that the principal was not due until the nine Burwell notes totaling $2,097,000, which were held by Fairchild, were paid. Interest of 4.1 percent was due on May 1, 1974. Thereafter, interest of 8 percent was due each May 1 during the term of the RCA notes.

The Burwell group held a third mortgage on the property's improvements to secure the RCA notes. The third mortgage was recorded on January 21, 1974.

The Burwell group's long-term ground lease (Ground Lease I) with MPI was dated May 1, 1973. It was recorded January 21, 1974. Ground Lease I was subject to the Kroger Lease.

---

[3]The precise balance of the first mortgage is not ascertainable from the record. For some purposes, the parties indicated that the balance was $1,336,018.30; for other purposes, they indicated that it was $1,341,863. Because a precise amount is irrelevant for our determination, we will use a rounded average of these two amounts, $1,339,000, for our analysis.

The Burwell group leased the land to MPI for a principal term of 35 years. Two renewal periods, each of 25 years, and a third renewal period of 14 years, made the potential term of the lease 99 years.

Rentals for the first 2 years were $12,500 per year. Rentals for the remainder of the principal term were $36,500 per year. Rentals for the renewal periods were as follows: first renewal period, $36,000 per year; second renewal period, $38,500 per year; third renewal period, $41,000 per year.

The transactions between Fairchild's corporations and the Burwell group included an abatement provision. The Burwell group's obligation to pay interest on the nine Burwell notes held by Fairchild would abate to the extent that MPI failed to pay the rentals associated with ground lease I and to the extent that RCA failed to pay the interest on the RCA notes.

The documents supporting the transactions between Fairchild's corporations and the Burwell group state effective dates of April 30, 1973, and May 1, 1973. The deal, however, had not been concluded by that time. Negotiations continued through the summer of 1973. The agreement for sale of the improvements was signed by the various parties on dates from August 22, 1973, to September 17, 1973. The deed formalizing the sale of the improvements was signed December 18, 1973. The third mortgage was signed November 16, 1973. Ground Lease I was signed on dates from August 27, 1973, to September 17, 1973. The deed, third mortgage, and Ground Lease I were recorded January 21, 1974.

The Burwell group received the Kroger rentals and paid the first mortgage payments to Union Central throughout 1973.

Fairchild took title to the buildings and leased the land through his corporations instead of taking title directly in order to prevent the Burwell notes from being extinguished.

### Fairchild's Transfers to Petitioners

Petitioners are 7 of the 10 individuals who acquired certain interests in the property as tenants in common (the co-tenants).

RCA conveyed the improvements and the Kroger Lease benefits to the co-tenants by a deed dated "as of" December 1, 1972. The deed was signed December 1, 1973. It was recorded July 9, 1979. The co-tenants' property interests were subject to

the Kroger Lease interests, the first, second and third mortgage interests, and the Ground Lease I interests.

The stated price for sale of the improvements and transfer of the Kroger Lease benefits was $4 million. The co-tenants paid $80,000 cash to RCA in December 1972. They also signed nonrecourse promissory notes totaling $3,920,000 (the co-tenants' notes). The principal was due in a balloon payment on November 30, 1987. Interest was payable as follows: 8 percent for the first $4\frac{1}{2}$ years; 5 percent for the next year; $4\frac{1}{2}$ percent for the remainder of the term excepting the final 6 months; and 7 percent during the final 6 months.

In addition, after the first $4\frac{1}{2}$ years, the co-tenants were obligated to pay as interest one-half of any increase in rentals received from the property above the amount provided in the original Kroger Lease (if any), up to an amount which would generate a total interest payment of 8 percent.

Interest was payable monthly, 7 months in advance. The co-tenants prepaid 7 months of interest in December 1972.

RCA took a fourth mortgage in the improvements and in the Kroger rentals to secure the performance on the co-tenants' notes. The fourth mortgage was dated "as of" December 1, 1972. It was signed by its parties from December 1, 1973, to December 18, 1973. It was recorded October 15, 1979.

RCA promised to hold the co-tenants harmless from obligations arising from the first, second and third mortgages, and Ground Lease I. Although the co-tenants' notes provided for payment of the $3,920,000 principal on November 30, 1987, the notes and the fourth mortgage also provided that no principal amount would become due until the first, second, and third mortgages had been extinguished.

MPI transferred an interest in the land to the co-tenants by a long-term ground lease (Ground Lease II). Ground Lease II provided that the co-tenants were "subleasing" MPI's interest which it acquired through Ground Lease I. Ground Lease II was dated "as of" December 1, 1972. It was signed by its various parties on dates from December 1, 1973, to December 18, 1973. It was recorded October 15, 1979.

Ground Lease II had a primary term of 35 years. The co-tenants were to pay a $90,000 per year rental for the first 4 years of the lease. Thereafter, they were to pay a rental composed of two parts: (1) A $20,000 per year base rental; and

(2) 10 percent of any increase in rentals derived from the property above the amount established in the original Kroger Lease.

Ground Lease II also contained renewal options for 25 and 39 years. Thus, Ground Lease II could extend 99 years. Rentals during the renewal periods were $20,000 per year base rent plus a 10-percent share of any increase in the income generated by the property above the level established in the Kroger Lease.

Late in 1972, the co-tenants received a document (the offering) in which Fairchild proposed terms for the deal. The offering contained the following excerpt from a Union Central internal memorandum dated January 13, 1966:

> The property, for it's [sic] age is, [sic] in good condition, and is being well maintained by The Kroger Co. The main office area is crowded and rather old-fashioned in terms of lighting and acoustic treatment, in comparison with present day facilities.
>
> I talked with the plant manager about the following points:
>
> (a) Present building operation and [sic] efficient vs. a new plant. He felt that their present operation was as efficient as it could be for the particular operations involved, and that a new location or layout would not improve production.
>
> (b) Room in the buildings for present and future operations. Present areas are adequate for production in the foreseeable future. The main problem with this site has always been parking. Moving of candy making operations for [sic] the State Street plant to Kroger's new facility on the Circle Freeway, and replacement by an instant coffee division requiring less operating personnel has reduced the parking problem.
>
> (c) Access to and from this site by truckers. Apparently no problems-reasonably good location to reach major highways, and store locations. There are good rail facilities at the site.
>
> I talked with urban renewal and city planning commission personnel about the general State Street area. Neither department has any plans now or in the future for this part of the town. The subject neighborhood has remained somewhat statis [sic] over the last few years. The property immediately north of our site sold in 1964 for $100,000. This property contains 94,525 sq. ft. and has many smaller type buildings. On the basis of a strictly land sale this would indicate land worth $1.05 sq. ft. This site has 411.12 foot frontage on State Street.
>
> The State Street property contains 709,138 sq. ft. of building area on 252,980 sq. ft. of land area. At the present time, Kroger is paying 45.8¢ per sq. ft. per year on a net lease basis for the State Street property. The next two renewal periods 1976–1981 and 1981–1986 reduce this rent to 14.14¢ per sq. ft. per year. The subsequent renewal periods reduce the rent to 10.5¢. It would seem that at these rents it would not be profitable to Kroger to move

their operations from this site and I would expect them to take advantage of the renewal options.

## The offering also contained the following statements:

Appraisal -  Wm. H. Beck 7/10/51
  Land          $204,685 - 256,580 sq. ft. - avg. 79.7¢
  Bldgs.        5,078,632 - 709,138 sq. ft. - avg. $7.16

Assessments - As of 3/1/67
  Land          $127,604 or 4.5% of Value
  Bldgs.        2,712,396 or 95.5% of Value

Assessments are from 40 to 50% of estimated market value. Therefore,

ESTIMATED MARKET VALUE As of 3/1/67

| | |
|---|---|
| Assessment at 40% of Value | $2,840,000 = 40% |
| | 2,840,000 = 40% |
| | 1,420,000 = 20% |
| Therefore, value at 40% of true value | $7,100,000 = 100% |
| Assessment at 50% of Value | $2,840,000 = 50% |
| | 2,840,000 = 50% |
| Therefore, value at 50% of true value | $5,680,000 = 100% |

## In addition, the offering contained the projection as shown on page 599.

## In addition, the offering contained the following discussion:

As noted earlier, the age of the improvements vary between 32 and 46 years. Therefore, it would appear that a 14.5 year life is very conservative, particularly when the largest building (250,987 sq. ft.) is over 46 years old and comprises 37% of the improvements and the newest building is 32 years old and the prime lease only has approximately 3.5 years to run. However, there is no guarantee on the basis of depreciation.

The present owners used a 40 year life on the expiration of the primary lease as the basis of depreciation, whichever was later. On this basis the depreciation shown would more than double. Although they were challenged by the government as to the reasonableness of the basis of depreciation, the government was willing to permit depreciation on the basis of a slightly larger life which would still be substantially shorter than life shown.

The former owners had purchased the property in 1967 for a price of $5,000,000 (which included the land). At this time, if a 50 year life had been used on [sic] the expiration of the primary lease, whichever were longer, the depreciation shown would increase to approximately $560,000/year instead of the 276,000 used in the illustration. Accordingly the depreciation taken in [sic] slightly less than one-half of that permitted under a 50 year life or the expiration of the primary lease whichever is longer. This assumption was an average value of $5.64/sq. ft. for the building being purchased ($5.64 × 709,138 sq. ft. = $3,999,953 or say $4,000,000).

| Year | Depreciation[1] | Ground rent | Mortgage interest | Total depreciation plus ground rent plus interest | Income | Tax loss | Tax savings in 50% bracket | Cash flow after ground rent and interest payment | After tax cash flow plus tax savings (50% bracket) after ground rent and interest payment |
|---|---|---|---|---|---|---|---|---|---|
| 1 | $276,000 | $90,000 | [2]$470,400 | $836,400 | $297,932 | $538,468 | $269,234 | ($262,468) | $6,766 |
| 2d - 4th | 276,000 | 90,000 | [3]313,600 | 679,600 | 325,016 | 354,584 | 177,292 | (78,584) | 98,708 |
| 5 | 276,000 | 20,000 | [4]196,000 | 492,000 | 137,503 | 354,497 | 177,248 | (78,497) | 98,751 |
| 6th - 14th | 276,000 | 20,000 | [5]176,400 | 472,400 | 100,000 | 372,400 | 186,200 | (96,400) | 89,800 |
| 15 | 136,000 | 20,000 | 137,200 | 293,200 | 79,166 | 214,034 | 107,017 | (78,034) | 28,893 |
| | 4,000,000 | | | | | | | | [6]1,238,781 |

[1] Depreciation based on 14½ years life. Based upon life being used by present owner, properly could be written off over a much shorter period in which event tax losses would increase. It is believed a depreciable life of one-half of that shown is not unreasonable.

[2] Represents 1st year interest plus 6 months prepaid interest at an 8% rate. Interest continues at 8% thru the first 4½ years.

[3] Represents 1st year interest plus 6 months prepaid interest at an 8% rate. Interest continues at 8% thru the first 4½ years.

[4] Interest at the rate of 5% per annum in advance or one-half of any increase in rent up to an amount that would equal 8%, whichever is greater.

[5] Interest at the rate of 4.5% per annum in advance or one-half of any increase in rent up to an amount that would equal 8%, whichever is greater.

[6] Interest at the rate of 3.5% per annum in advance or one-half of any increase in rent up to an amount that would equal 8%, whichever is greater.

[6] If amounts shown above had been invested at 6% net compounded annually, there would be $1,911,392 available therefrom at the end of 15 years.

Each of the petitioners is a physician. They learned of the offering in various ways. Fairchild called the petitioners with whom he had had prior dealings. Clyde Curtis, an associate of Fairchild, contacted the others.

Each of the petitioners paid his allocable share of the $80,000 cash payment and 7 months of prepaid interest in December 1972. Yet the agreement was not finalized and the documents were not prepared and signed until late 1973.

The petitioners' shares in the venture were as follows:

| Petitioners | Shares[4] |
|---|---|
| Odend'hal | 13% |
| Cassidy | 12% |
| Mann | 10% |
| Magal | 10% |
| Stanton | 10% |
| Allen | 10% |
| Yu | 10% |

Fairchild did everything which was necessary to complete the transaction although it was explicitly understood that Fairchild was acting as a principal and not as the co-tenants' agent. Fairchild set the terms of the deal. The petitioners did not negotiate any of the terms. They merely accepted Fairchild's initial offer. Fairchild also prepared the documents which memorialized the agreement. In addition, Fairchild was the escrow agent for the transaction.

None of the petitioners were represented by an attorney in this transaction. Neither did any of them have an appraisal of the property made nor did any of them contact a real estate expert in the Cincinnati area to ascertain the fairness of the purchase price. None of the petitioners personally inspected the property or had a title search conducted concerning the property before they paid Fairchild.

None of the petitioners have expertise in the grocery warehousing or manufacturing business. And none of the petitioners contacted an officer of Kroger to ascertain Kroger's

---

[4]The three co-tenants who are not petitioners in this controversy and their shares are:

| Co-tenants | Shares |
|---|---|
| Vacit Y. Ozberkmen | 10% |
| Branko S. Valenti | 10% |
| Robert L. Ackerly | 5% |

intentions with regard to renewing the lease or renegotiating its terms.

Before spending their money in December 1972, several of the petitioners discussed two aspects of the proposed venture with third parties: (1) Fairchild's reputation for honesty and squaredealing; and (2) the tax benefits inherent in commercial real estate investments. None of the petitioners discussed the details of the proposed transaction with a third party. Also, none of the petitioners discussed with a third party the venture's potential for profit, absent tax considerations.

Petitioners continued to rely on Fairchild after they acquired their property interests. Fairchild took responsibility for recording the deed, the fourth mortgage, and Ground Lease II. He did not record these documents until 1979. Fairchild collected the Kroger rentals and made the first mortgage payments to Union Central.

Fairchild invoiced the petitioners each month. In the invoices, Fairchild charged petitioners for the interest due on the co-tenants' notes and the rentals due on Ground Lease II. He also credited petitioners with the Kroger rentals received that month. Then the invoices billed petitioners for the net amount by which the interest and ground rent exceeded the Kroger rentals. Checks for the net amount were to be payable to "Fairchild and Company."

In addition, Fairchild prepared a statement concerning the tax consequences of the venture for each petitioner at the end of each year. Fairchild also answered petitioners' particular questions concerning the tax status of the venture from time to time.

Fairchild also interfaced between petitioners and Kroger when Kroger considered replacing an old building on the property with a new structure. Fairchild tried to renegotiate the Kroger Lease in conjunction with such a project. These communications occurred after 1972. Ultimately, Kroger did not build a new structure or renegotiate the lease.

In 1977, Fairchild offered to repurchase, through his wife, one petitioner's interest when that petitioner was thinking of terminating his participation in the venture.

Before petitioners acquired their interests, Kroger decided to continue production on the property and to make leasehold

improvements with the intent of exercising all renewal options in their lease.

Before acquiring their interests in the property, several of the petitioners previously purchased realty based on Fairchild's advice. Fairchild acted as the petitioner's investment adviser in these prior transactions. None of the petitioners previously purchased real estate from Fairchild.

Assessment records for Hamilton County, Ohio, show that the true value (as that term is used for real property assessment purposes) of the improvements was $2,128,870 between December 1, 1972, and January 16, 1974.

Starting December 1, 1972, petitioners claimed losses connected with the property. These losses stemmed from the fact that claimed interest, rental, and depreciation deductions exceeded the income which petitioners received from the Kroger rentals.

## II. SECTION 6651(a) ADDITION TO TAX ISSUE

Petitioner Odend'hal did not timely file his returns for 1975 and 1976. Respondent received Odend'hal's 1975 return on December 27, 1976. Respondent received Odend'hal's 1976 return on January 30, 1978. Odend'hal filed these returns late because he and his accountant were busy doing other things.

### ULTIMATE FINDING OF FACT

The fair market value of the co-tenants' interests in the buildings and the Kroger Lease benefits did not exceed $2 million upon acquisition.

### OPINION

## I. KROGER PROPERTY ISSUES

Petitioners claim interest, depreciation, and rental deductions associated with their interests in the property.

Respondent determined that petitioners are not entitled to deductions related to the property to the extent such deductions exceeded the income generated by the property. Respondent asserts the following theories to support his determination: (1) Petitioners' acquisition and holding of interests in the property were not activities entered into for profit as required by section 183; (2) the purported purchase of the property was

a sham acquisition having no commercial economic substance other than anticipated tax benefits: since there was no bona fide "purchase," reported deductions should be disallowed, and reported "income" should not be included; and (3) even if the transaction had any economic substance, it was, at most, the acquisition of an option right to purchase the warehouse, exercisable on the making of the balloon payment at the expiration of 15 years, and not the purchase of a present ownership interest.

Respondent also challenged the useful life used by some petitioners in computing the depreciation deductions associated with the improvements.

For reasons subsequently discussed, we agree with respondent that the deductions which exceeded income from the property lacked sufficient economic substance and must be disallowed.[5] The $4 million purchase price for the buildings and Kroger Lease benefits, and the nonrecourse amount associated therewith, exceeded the value of such interests by a factor of two. In this situation, the nonrecourse note is not genuine indebtedness for purposes of the interest deduction. Nor is the nonrecourse note an actual investment in the property for purposes of the depreciation deduction. Accordingly, petitioners are not entitled to deduct interest payments on the nonrecourse note or to include the nonrecourse note's principal amount in depreciable basis.

This result requires the disallowance of all deductions exceeding income from the property.[6] Thus, we do not decide if petitioners' cash downpayment or ground rentals had sufficient economic substance to support deductibility. Also, we need not consider respondent's other arguments or the depreciation issue.

---

[5] We do not hold that the purchase never occurred nor do we hold that it was a sham. We are satisfied that petitioners in fact obtained interests in the property. We, instead, hold that the nonrecourse debt lacked sufficient substance to constitute genuine indebtedness or an actual investment in the property for tax purposes.

[6] Because respondent determined only that petitioners could not deduct expenses exceeding income from the property, we need not decide whether additional disallowances would be appropriate in this case.

## *The Law*

Recent cases establish the rule concerning the deductibility of interest and depreciation related to nonrecourse loans in transactions where the purchase price and the nonrecourse liability reflect an inflated amount. In *Hager v. Commissioner*, 76 T.C. 759 (1981), we said:

It is settled that amounts paid as interest must be paid on genuine indebtedness to be deductible under section 163(a) (*Knetsch v. United States*, 364 U.S. 361 (1960); *Narver v. Commissioner*, 75 T.C. 53, 98 (1980), on appeal (9th Cir., Jan. 15, 1981); *Golsen v. Commissioner*, 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971)), and that depreciation must be based on an actual investment in property to be deductible under section 167 (*Narver v. Commissioner, supra* at 98; *Mayerson v. Commissioner*, 47 T.C. 340, 350 (1968)). In the usual sale of property, if part or all of the purchase price is deferred, the obligation to pay the deferred amount represents genuine indebtedness and an investment in property. Even if such an obligation is secured only by the transferred property or other property and the buyer has no personal liability for its payment, the obligation still represents genuine indebtedness and an investment in property. *Mayerson v. Commissioner, supra* at 351–352; see *Crane v. Commissioner*, 331 U.S. 1 (1946). However, such conclusions do not follow when the principal amount of such nonrecourse indebtedness unreasonably exceeds the value of the security therefor because, under such circumstances, it is patent that the purchaser has no incentive to pay off the obligation. [76 T.C. at 773–774.]

If the purchase price and the principal amount of the nonrecourse note unreasonably exceed the value of the property, then no "genuine indebtedness" exists and no "investment in the property" occurs.[7] *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Hager v. Commissioner*, 76 T.C. 759 (1981); *Narver v. Commissioner*, 75 T.C. 53 (1980), affd. 670 F.2d 855 (9th Cir. 1982); *Beck v. Commissioner*, 74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982).

In *Estate of Franklin v. Commissioner, supra*, the Circuit

---

[7]We note that in *Brannen v. Commissioner*, 78 T.C. 471 (1982), on appeal (11th Cir., Aug. 23, 1982), we stated that the test was whether the stated *purchase price* unreasonably exceeds the value of the property (78 T.C. at 493), whereas in *Hager* we stated that the test was whether the *principal amount of the nonrecourse indebtedness* unreasonably exceeds the value of the property (76 T.C. at 773). We do not decide which test is appropriate on the facts before us (see *Brannen v. Commissioner*, 78 T.C. at 513 (Chabot, J., concurring)), because we find that both the purchase price and the principal amount of the nonrecourse debt unreasonably exceeded the value of the buildings and the Kroger Lease benefits.

Court of Appeals articulated the following rationale for the rule:

An acquisition such as that of Associates if at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale.

No such meshing occurs when the purchase price exceeds a demonstrably reasonable estimate of the fair market value. Payments on the principal of the purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value. Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. While this chance undoubtedly influenced the Tax Court's determination that the transaction before us constitutes an option, we need only point out that its existence fails to supply the substance necessary to justify treating the transaction as a sale *ab initio*. It is not necessary to the disposition of this case to decide the tax consequences of a transaction such as that before us if in a subsequent year the fair market value of the property increases to an extent that permits the purchaser to acquire an equity. [544 F.2d at 1048–1049. Fn. refs. omitted.]

The court also said:

To justify the deduction the debt must exist; potential existence will not do. For debt to exist, the purchaser, in the absence of personal liability, must confront a situation in which it is presently reasonable from an economic point of view for him to make a capital investment in the amount of the unpaid purchase price. * * * [544 F.2d at 1049.]

Interest and depreciation deductions, however, will not be disallowed if the purchase price and principal amount of nonrecourse debt exceed the value of the property because of a bad bargain. *Estate of Franklin v. Commissioner*, 544 F.2d at 1049; *Hager v. Commissioner*, 76 T.C. at 774.

### Application of the Law to the Facts of This Case

We must determine if the $4 million purchase price and the $3.92 million nonrecourse amount unreasonably exceeded the value of the buildings and Kroger Lease benefits when the co-tenants acquired these interests.[8] Accordingly, the key inquiry

---

[8]Petitioners treated their acquisition as though they acquired their interests in 1972. Under the after acquired property doctrine, they probably did not acquire their interests until 1973, when Fairchild, their seller, acquired his interests. The difference does not affect

is the determination of the value of the buildings and Kroger Lease benefits.

This inquiry, of course, presents a question of fact. Ordinarily, the burden of proof is on the petitioner. Rule 142(a).[9] However, the respondent raised the economic substance argument in amended answers in some dockets of this consolidated litigation. The burden of proof shifts to the respondent on "new matters" which he raises in his answer. Rule 142(a). We do not need to decide if respondent's economic substance argument raises a new matter in the dockets in which the argument was first raised by amended answer because we find that the purchase price and the nonrecourse amount unreasonably exceeded the value of the buildings and Kroger Lease benefits regardless of the party which bears the burden of proof.

Respondent's two experts, Robert A. Jackson (Jackson) and William H. Haskell, Jr. (Haskell), opined in separate reports on the value of the co-tenants' interests in the property as of December 1, 1972. Petitioners admitted that Jackson and Haskell are qualified to make such real estate appraisals.

Jackson and Haskell each appraised a "leased fee interest." The leased fee interest is a fee interest subject to a lease which conveyed the right to use and occupy the property to a third party. Thus, the owners' rights under a leased fee interest include the right to receive rental income under the lease and the right to repossess the property at the termination of the lease.

The experts' analysis thus evaluated both (1) the co-tenants' interests in the buildings and Kroger Lease benefits which they acquired from RCA; and (2) the co-tenants' interests in the land which they acquired under the Ground Lease II from MPI.[10] As previously discussed, we need only compare the value of the co-tenants' interests in the buildings and the Kroger Lease benefits (bundle No. 1) with the $4 million purchase price and $3,920,000 nonrecourse note. Comparison

---

our decision on the facts of this case. Accordingly, we assume, for simplicity's sake, that petitioners' acquisition occurred in 1972.

[9] All Rule references are to the Tax Court Rules of Practice and Procedure.

[10] For purposes of this case, the co-tenants' reversionary interests in the land under Ground Lease II, which could extend for 99 years, are effectively equivalent to the experts' assumption that the co-tenants' reversionary interests were fee interests.

of the value of the co-tenants' interests in the land under Ground Lease II (bundle No. 2) is not necessary in this case.

Nevertheless, the experts' determinations that the aggregate value of bundles No. 1 and No. 2 is much less than the $4 million purchase price of bundle No. 1 alone aids us because it necessarily implies that the $4 million purchase price for bundle No. 1 also far exceeds the value of bundle No. 1 alone.

The experts' appraisals each contained two parts: (1) Valuation of the Kroger Lease rentals; and (2) valuation of the reversion arising after the termination of the Kroger Lease. Both experts assumed that Kroger would exercise all of the lease's renewal options. This assumption is appropriate because the parties stipulated that Kroger intended to exercise all renewal options.

The experts discounted the rentals due under the Kroger Lease to determine the December 1, 1972, value of this income stream. Both experts carefully considered the risk inherent in this transaction as compared with other commercial real estate ventures before setting an appropriate discount rate. Jackson chose 9 percent for his discount rate. Accordingly, he determined that the stream of rentals due under the Kroger Lease was worth $1,628,073 as of December 1, 1972.

Haskell chose 8.5 percent for his discount rate. Accordingly, he determined that the stream of Kroger rentals was worth $1,711,597 as of December 1, 1972.

The experts took different approaches in evaluating the reversionary interest. After carefully considering the sales prices of comparable properties in the Cincinnati area, Jackson determined that a fee simple absolute interest in the property was worth approximately $3 million in 1972. He assumed that the co-tenants' fee simple absolute interest[11] would be worth this amount when it reverted to the co-tenants in 1996. Jackson discounted this $3 million amount with a 9-percent discount rate to determine that the reversionary interest was worth $362,052 on December 1, 1972. Accordingly, Jackson concluded that the co-tenants' total interests were worth $1,990,125 on December 1, 1972.

Jackson determined the value of the co-tenants' interests

---

[11]See note 10 *supra*.

using the same technique for the following alternative valuation dates:

| Alternative valuation date | Value |
| --- | --- |
| Apr. 30, 1973 | $1,927,304 |
| Jan. 21, 1974 | 1,812,240 |

Haskell assumed that the buildings would be at the end of their useful lives when the co-tenants got their fee simple absolute in 1996.[12] He also assumed that the residual value of the buildings and salvage value would be used to demolish the buildings and to clear the site. In short, Haskell assumed that the co-tenants would get raw land in 1996.

Accordingly, Haskell analyzed comparable properties to determine the value of raw land. He determined that the land itself was worth $341,523 in 1972. He assumed that the co-tenants' interest would be worth this amount when it reverted to petitioners in 1996. Haskell discounted this $341,523 amount with an 8.8-percent rate to determine that the reversionary interest was worth $43,192 on December 1, 1972.

Therefore, Haskell concluded that the co-tenants' total interests were worth $1,711,597 on December 1, 1972. Using the same technique, Haskell determined that the co-tenants' interests were worth $1,633,637 on the alternative valuation date of May 1, 1973.

Petitioners make no arguments challenging the experts' application of the income method of evaluation (such as choice of discount rate, choice of comparable properties, etc.).[13] Petitioners' only attempt to discredit the experts' testimony concerns Jackson's credibility. On cross-examination, the following colloquy occurred:

Q. Now, then you referred to the property being transferred on May 1, 1967 from Fairchild to Burwell, Butcher and Roberts and you said nothing in your report about that transaction?

A. That's correct.

Q. Why did you ignore that transaction?

---

[12]See note 10 supra.

[13]Petitioners argue that the experts' income method should be ignored as irrelevant because the prior sales of the property show that $4 million was a fair market price for the co-tenants' interests. We discuss this argument subsequently.

A. Because about that point in time there were so many confusing documents that I saw, that I couldn't understand them. The transfers back and forth, the first, second, third and fourth mortgage, the 99 year leases and non-cancelable notes, that was—I've never seen such complicated real estate deal, so I really didn't understand it.

More importantly than that, I was valuing the lessor's interest as of 12/1/72.

Petitioners argue that if Jackson could not understand the Burwell group transactions, then he is incompetent and his entire report is suspect.

We disagree with petitioners that Jackson's statement renders his opinion unreliable. We think that Jackson's report is a professional job which demonstrates that Jackson does competent work on the matters on which he focuses. Jackson testified that the gyrations in the sales price of the property (i.e., the sales price twice doubled in back-to-back sales) convinced him not to rely on the Burwell group transactions as evidence of fair market value. Thus, he determined that an income approach would more accurately estimate value than the prior sales history. In this context, we understand Jackson to say that he did not spend the time necessary to understand the details of the Burwell group transactions because they were complicated and beyond the scope of his focus.

We agree with respondent's experts that the income approach provides a realistic method for evaluating the co-tenants' interests. We find the expert's valuation of the Kroger rental stream to be sound. We have some reservations, however, concerning the experts' evaluation of the co-tenants' reversionary interest. We think it debatable to assume, as Haskell did, that the co-tenants will receive only raw land in 1996. After a careful examination of the facts, including Kroger's responsibilities under the lease, we think that the property will continue to be useful as improved land when the co-tenants take possession in 1996. Accordingly, we conclude that Jackson's approach, which analyzed comparable improved properties, is more appropriate than Haskell's approach.

One also might have slight reservations concerning the experts' assumption that the property will be worth the same amount in 1996 as it was in 1972. Clearly it is difficult, if not impossible, to estimate accurately the value of anything 25 years in advance. However, since in any event the value of the

reversion constitutes such a small part of the 1972 value of the co-tenants' total interests due to the nature of the discounting process, we deem it bootless in this context to speculate as to any different value which may exist in 1996.

Although, as is usually the case with expert reports, we might not agree with every detail of the reports, we think that they provide an adequate basis for evaluating the co-tenants' interests. Based on our careful consideration of these reports and of all the other relevant facts contained in the record, we are convinced that the co-tenants' interests in the buildings and Kroger Lease benefits were worth not more than $2 million when acquired.

Our conclusion is supported by the fact that Union Central sold the leased fee interest to Fairchild for $2,670,000 in 1967. The Union Central sale provides a good benchmark of fair market value because it involved two unrelated parties which were each motivated by mutually exclusive interests. Fairchild wanted the price to be as low as possible to maximize any gain on resale. Union Central, however, was terminating its interest in the property. Accordingly, it wanted as high a sales price as possible. Both parties were, or had available, real estate experts. Union Central calculated the sales price as its best estimate of the value of the future rentals due under the Kroger Lease plus the value of the reversion. Accordingly, we find this sale to be good evidence of the fair market value of the property in 1967.

We think that the value of the property would have dropped between 1967 and the time of petitioners' acquisition because the stepdown in rentals due under the Kroger Lease was much closer in 1972 than it was in 1967. Also, the interest rates, which affect the discounting process, rose during the period. Furthermore, the co-tenants received a smaller bundle of property interests from RCA than Fairchild received from Union Central. Accordingly, the value of the co-tenant's interests acquired from RCA should be somewhat smaller than the value of the Union Central - Fairchild transfer to account for the missing land interests. In short, we think that the Union Central sale for $2,670,000 in 1967 supports our conclusion that the co-tenants' interests were worth no more than $2 million in 1972.

Petitioners argue that the $4 million purchase price was

reasonable because the property's history shows several sales in the $4 to $5 million range. Petitioners' argument relies on the following numbers:

| Seller | Buyer | Date | Price |
|--------|-------|------|-------|
| Kroger | Union Central | 1951 | $5,000,000 |
| Union Central | Fairchild | 1967 | 2,670,000 |
| Fairchild | Burwell group | 1967 | 5,000,000 |
| Burwell group | Fairchild | 1973 | 4,134,018 |
| Fairchild | Co-tenants | 1972 | 4,000,000 |

Petitioners argue that this prior history is the best evidence of the value of the co-tenants' interests and that it conclusively demonstrates that the value was at least $4 million. Petitioners claim that the $2,670,000 sale by Union Central constituted an aberration. They argue that Fairchild found a bargain.

Although we agree with petitioners that sales between unrelated third parties can provide persuasive evidence of fair market value, we disagree with petitioners' conclusions on the facts of this case. We will analyze each of the prior sales.

We think that Kroger sold the property for its fair market value in 1951. However, this sale gave Union Central the full fee simple absolute. Therefore, this sale is of limited relevance in determining the value of a leased fee interest in the property. Also, we note that the sale occurred over 20 years prior to petitioners' acquisition. This amount of time certainly lowers the relevance, and thus the weight, of the evidence concerning the 1951 transaction. Petitioners argue that inflation from 1951 to 1972 would have increased the 1951 price tag of $5 million to approximately $7 million by 1972. We find no evidence, however, that the value of the property maintained pace with inflation. Certainly many factors in addition to inflation could have affected the dollar value of the property between 1951 and 1972. We think that evidence concerning the 1951 sales price is of little or no help in determining the 1972 value. It certainly is not as persuasive as respondent's 1972 estimates based on the income method or as relevant as the 1967 sale by Union Central.

Petitioners also argue that the 1967 sale by Fairchild for $5 million and the 1973 sale by the Burwell group to Fairchild's corporation for $4,134,018 were arm's-length transactions which show that the value of the co-tenants' interests must

have been at least $4 million. However, we found as a fact that the sales price in the 1973 Burwell group transaction was only $2,040,000, not $4,134,018 as argued by petitioners. Analysis of the documents supporting the transaction and other evidence in the record clearly shows that RCA did not take subject to all 10 Burwell notes. RCA took subject only to the Burwell note held by Georgetown University. The Burwell group promised to hold RCA harmless on the other 9 Burwell notes. Accordingly, the purchase price was only $2,040,000. This transaction, therefore, supports the conclusion that the value of the co-tenants' interests was about $2 million rather than a conclusion that the value was in the $4 to $5 million range.

Also, we do not think that the 1967 sale by Fairchild to the Burwell group for $5 million is a good indicator of fair market value. Fairchild purchased the property within the previous month for $2,670,000. The doubling of the purchase price in such a back-to-back sale makes us question whether the second sales price reflects the fair market value, because there is nothing in the record to indicate how such a dramatic change could have occurred within a few weeks. See *Brannen v. Commissioner*, 78 T.C. at 497–499, and *Narver v. Commissioner*, 75 T.C. at 96–98. Petitioners suggest that Fairchild's acquisition of the property for $2,670,000 was a bargain purchase. As discussed before, we disagree. We do not think, on the facts of this case, that Union Central would have sold property worth $4 to $5 million for $2,670,000.

Instead, we think that the $5 million price charged by Fairchild was inflated. We do not think that investors would buy developed commercial real estate for $5 million and then sell it 5 years later for $2 million if the fair market value was in the $5 million range, absent evidence of a marked decline in the relevant real estate market which certainly is not present in this case. We find it incredible that the $5 million price tag reflected value because the Burwell group sold the property for $2 million to Fairchild, their original seller, who already had obtained a new set of buyers willing to pay $4 million. Instead, we think that Fairchild and the Burwell group inflated the purchase price in an attempt to let the Burwell group take bigger tax benefits associated with the higher purchase price. We also think that Fairchild again inflated the

purchase price for the co-tenants in 1972 when he bought the property for $2 million and sold it to them for $4 million.

Petitioners also argue that they anticipated an advantageous renegotiation of the Kroger lease when they purchased their interests in the property. Such a renegotiation could have increased the value of their interests. Unfortunately for petitioners, the record fails to support their position.

Petitioners testified that they expected Kroger to construct a new building on the property. Petitioners expected Kroger to renegotiate the lease concurrent with construction so that Kroger would keep a possessory interest in the property beyond 1996. Petitioners anticipated higher rentals as a result of such a renegotiation.

There is no direct evidence supporting petitioners' position that Kroger contemplated renegotiation before petitioners decided to buy the property in 1972. Petitioners apparently relied on Fairchild's oral representation that Kroger should consider such a renegotiation. Petitioners never contacted Kroger directly on this matter. Fairchild conducted discussions with Kroger about the possibility of renegotiations. But these discussions all occurred after 1972. Kroger never pursued the discussions beyond a preliminary stage.

We think that if any part of the $4 million purchase price covered a planned or potential renegotiation of the Kroger Lease, then petitioners would have had the matter included in writing as part of the documents involved in the sale. No such writing appears in the record. At the very least, petitioners would have contacted Kroger before their purchase to discuss the matter before agreeing to an increase in the purchase price based on Kroger's purported renegotiation. No such discussions occurred.

Based on the record in this case, we do not think that a realistic chance of renegotiation existed prior to petitioners' acquisition. Any expectations of a renegotiation harbored by petitioners before their purchase were mere hopes which we do not think could have affected the purchase price.

Petitioners' expert, Elgin Groseclose (Groseclose), provided a report in which he attempted to show that petitioners' transaction contained economic substance. Groseclose candidly admitted that he was not qualified as a real estate appraiser and that his report did not purport to estimate the value of the

co-tenants' interests in the property. Instead, Groseclose split the transaction into two parts. He sought to justify each piece of the transaction (and thus the aggregate transaction) on economic grounds.

First, Groseclose analyzed petitioners' purchase without the financing. Groseclose compared the income from the property (the Kroger rentals) with the expenses (the rent due under Ground Lease II) to compute a yield on petitioners' investment. Thus, Groseclose ignored interest costs. Groseclose's calculations showed an average yield between 1972 and 1976 of 6.1 percent and an average yield between 1977 and 1996 of only 2.7 percent. Groseclose maintained that this yield compared favorably with other investments of the period.

Second, Groseclose analyzed the financing aspects of the transaction. Groseclose calculated that the average interest cost was 6.2 percent per year. He maintained that the loan amount could have been invested in corporate bonds and returned 7 to 8 percent. Groseclose claims that this difference in rates would itself yield petitioners a profit.

Groseclose's report analyzed the financial transactions as follows:

> While the transaction was all part and parcel of a single negotiation, the transaction also stands alone, that of a debtor, owner of structures producing a stream of income, pledging these properties for a loan from a willing lender in the amount of 98 per cent of the purchase price of the properties, secured only by the properties and income therefrom.
>
> In this light, disregarding the question of whether the lender was lending for fun or for profit, to the owners of the several interests the question is one of comparable investment vehicles, no different, except in degree, from that of a man who mortgages his home to buy stocks or to obtain cash for a business enterprise.
>
> The annual cost of the mortgage loan is set forth in Table 5, which shows the mean annual interest cost to be $243,367, or 6.2 per cent. At the time the loan was taken, the same sum could have been invested at the following rates:
>
>> Moody's composite of domestic corporate bonds 7.47%
>>> Rating Aaa                  7.08%
>>> Rating Baa                  7.93%
>> Real estate mortgage
>>> (New homes, U.S. average)       7.50%
>>> Source:     U.S. Department of Commerce,
>>>                Survey of Business.
>
> Invested in real estate mortgages at the mean rate, over the term of the

loan, the difference in yield would have been 1.3 per cent per year, and for a loan of $3,920,000, a total of some $50,000 a year.

We may carry the step further, as a financial manager would do, and consider the return available on the margin between the cost of money and the yield obtainable. If the excess were invested annually in a savings bank pass book account at 4½ per cent, the compounded amount at the end of 15 years would be $1,085,965.

Apparently, Groseclose's conclusion that the financing of the transaction could have itself been profitable is based on a hypothetical of mortgaging out by the co-tenants for $3,920,000 in cash and the reinvestment of the cash in high yield securities. This assumption is not true in this case. The co-tenants did not receive $3,920,000 cash. They received property interests worth no more than $2 million. Accordingly, the co-tenants could not have made money by reinvesting cash proceeds in bonds. Furthermore, we perceive no way that the co-tenants could profit from the interest rate differential through a refinancing, a wraparound mortgage, or other financial device because the principal amount of the nonrecourse note exceeded the fair market value of the co-tenants' interests. Therefore, we do not think that the financing transaction by itself could yield the co-tenants an economic advantage.

When analyzing the basic transaction together with its financing aspects, it is clear that the cash flow would be negative every year because interest payments plus rentals due under Ground Lease II were designed to exceed rental income under the Kroger Lease. Accordingly, we are not persuaded by Groseclose's attempt to justify the transaction on economic grounds.

Petitioners also argue that they purchased their interests to hold for long-term appreciation. Petitioners argue that the transaction contains economic substance because the anticipated appreciation would exceed the cost of carrying their investment.

Petitioners' appreciation argument, however, fails to justify taking depreciation and interest deductions in cases such as this case where they acquired their interests for a purchase price and with a nonrecourse amount which unreasonably exceeded the value of their interests. The Circuit Court rejected the appreciation argument in *Estate of Franklin v. Commissioner, supra.* In that case, the court said:

it has long been recognized that the absence of personal liability for the purchase money debt secured by a mortgage on the acquired property does not deprive the debt of its character as a bona fide debt obligation able to support an interest deduction. *Mayerson, supra* at 352. However, this is no longer true when it appears that the debt has economic significance only if the property substantially appreciates in value prior to the date at which a very large portion of the purchase price is to be discharged. Under these circumstances the purchaser has not secured "the use or forbearance of money." *See Norton v. Commissioner*, 474 F.2d 608, 610 (9th Cir. 1973). Nor has the seller advanced money or forborne its use. *See Bornstein v. Commissioner*, 334 F.2d 779, 780 (1st Cir. 1964); *Lynch v. Commissioner*, 273 F.2d 867, 871-872 (2d Cir. 1959). Prior to the date at which the balloon payment on the purchase price is required, and assuming no substantial increase in the fair market value of the property, the absence of personal liability on the debt reduces the transaction in economic terms to a mere chance that a genuine debt obligation may arise. This is not enough to justify an interest deduction. To justify the deduction the debt must exist; potential existence will not do. For debt to exist, the purchaser, in the absence of personal liability, must confront a situation in which it is presently reasonable from an economic point of view for him to make a capital investment in the amount of the unpaid purchase price. *See Mayerson, supra* at 352. Associates, during the taxable years in question, confronted no such situation. *Compare Crane v. Commissioner*, 331 U.S. 1, 11-12, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947). [544 F.2d at 1049. Fn. ref. omitted.]

In this case, as in *Estate of Franklin*, the taxpayers acquired interests for a purchase price and with a nonrecourse amount which far exceeded the fair market value of the interests. In this case, as in *Estate of Franklin*, the taxpayers would not pay the nonrecourse amount, and thus practically all of the purchase price, until a time far in the future when the balloon payment is due.

On these facts, petitioners could not "rather quickly [establish] an equity in the property which the purchaser could not prudently abandon." 544 F.2d at 1048. Petitioners did not confront a situation in which it was reasonable from an economic point of view during the years at issue for them to make a capital investment in the amount of the unpaid purchase price. 544 F.2d at 1049.

Investing with the expectation of long-term appreciation in these circumstances is not the "stuff of substance" which justifies "treating the transaction as a sale *ab initio*." 544 F.2d 1048. Therefore, petitioners cannot take the interest and depreciation deductions associated with the nonrecourse amount. *Estate of Franklin v. Commissioner, supra*.

Petitioners' final argument is that they made a bad bargain and thus are outside of the scope of the *Estate of Franklin* rule. The Circuit Court of Appeals stated in *Estate of Franklin v. Commissioner, supra,* that:

Our focus on the relationship of the fair market value of the property to the unpaid purchase price should not be read as premised upon the belief that a sale is not a sale if the purchaser pays too much. Bad bargains from the buyer's point of view—as well as sensible bargains from buyer's, but exceptionally good from the seller's point of view—do not thereby cease to be sales. *See Commissioner v. Brown,* 380 U.S. 563, 67 S.Ct. 1047, 91 L.Ed. 1301 (1965); *Union Bank v. United States,* 285 F.2d 126, 128, 152 Ct.Cl. 126 (1961). We intend our holding and explanation thereof to be understood as limited to transactions substantially similar to that now before us. [544 F.2d at 1049.]

The record does not support petitioners' argument. The facts show that petitioners did not bargain at all. They merely accepted Fairchild's offering which on its face guaranteed petitioners that they would lose money, absent tax considerations. Furthermore, none of the petitioners had an appraisal of the property made, had a title search conducted, or did anything except rely on Fairchild, who was acting as a principal in his capacity as the seller.

Based on the facts in this case, we do not think that petitioners merely made a bad bargain. Instead, we think that they, with help from Fairchild, purposefully structured the transaction so that the purchase price and nonrecourse amount unreasonably exceeded the value of their interests.

In other words, the promoter, Fairchild, merely recycled previously "worked" property to obtain unjustified tax benefits for his customers. His principal means of accomplishing this were a grossly inflated value placed on the interests sold and nonrecourse debt. The projections contained in the offering memorandum amply demonstrate the objective.

In sum, the evidence in this case convinces us that the fair market value of the co-tenants' interests in the buildings and Kroger Lease benefits was not greater than $2 million upon acquisition. Thus, we find that the $4 million purchase price and the $3,920,000 nonrecourse amount unreasonably exceeded the value of the co-tenants' interests. See *Estate of Franklin v. Commissioner, supra.* Accordingly, we hold that, under the rule of *Estate of Franklin* and its progeny, petitioners may not include the nonrecourse amount in depreciable basis, nor may

they deduct interest paid on the nonrecourse amount, since the nonrecourse amount did not constitute genuine indebtedness or an actual investment in the property.

## II. INCOME AVERAGING ISSUE

Petitioners Yu and Stanton used the income averaging provisions of sections 1301 to 1305 to determine their income tax liabilities for the years at issue in this case. During the section 1302 base period, these petitioners took depreciation and interest deductions associated with the nonrecourse note on the property in an amount which exceeded the income from the property. The section 6501 statute of limitations has expired for these base years.

Respondent maintains that petitioners' income for these base years must be recomputed in accordance with our conclusions in the previous section of this opinion for purposes of determining petitioners' correct taxable income for the years currently before the Court. Petitioners contend that the income levels to be used in the income averaging computations should be the income as reported instead of the correct level of income. Respondent clearly is correct and petitioners are incorrect on this issue. *Unser v. Commissioner*, 59 T.C. 528 (1973).

## III. SECTION 6651(a) ADDITION TO TAX ISSUE

Petitioner Odend'hal did not timely file his returns for 1975 and 1976. Odend'hal filed these returns late because he and his accountant were busy doing other things. The petitioner's busy schedule does not constitute reasonable cause for failure to file his returns on time. He is liable for the section 6651(a) addition to tax as determined by the respondent.

## IV. ATTORNEYS' FEES ISSUE

Petitioners request an award of attorneys' fees. Petitioners' request is denied. *McQuiston v. Commissioner*, 78 T.C. 807 (1982), on appeal (9th Cir., Aug. 17, 1982). Contrast sec. 7430 (which gives the Court authority to grant attorney fees in

certain circumstances in cases instituted after February 28, 1983).

*Decisions will be entered under Rule 155.*