Stanford I. Snyder and Jerry W. Snyder v. Commissioner.
Snyder v. Commissioner
Docket No. 2669-81.
United States Tax Court
T.C. Memo 1985-9; 1985 Tax Ct. Memo LEXIS 622; 49 T.C.M. (CCH) 452; T.C.M. (RIA) 85009; January 7, 1985
Shlomo Aaron Beilis and William A. Mander, for the petitioners. John M. Elias, for the respondent. HAMBLEN
*452 Memorandum Findings of Fact and Opinion HAMBLEN, Judge: Respondent determined *624 deficiencies in the amount of $18,682.00 in petitioners' joint 1977 Federal income taxes. The issues for decision are whether petitioners are entitled to various deductions and credits claimed in connection with Stanford Snyder's purchase of the rights in the master recording titled "Global Considerations". Findings of Fact Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Stanford Snyder ("Snyder") and Jerry Snyder [1] resided in Riverside, Connecticut, when they filed their petition in this case. In March of 1977, petitioner resigned his position as vice-president of National Accounts Marketing at CBS Records, Inc. ("CBS"). Petitioner left CBS to form his own company "Cleveland International Records ("Cleveland"). Upon resigning, petitioner received a distribution from his corporate investment fund and his *625 vested retirement account of approximately $10,000.00. Petitioner approached Bert Padell ("Padell") seeking tax and investment advice *453 with respect to the distribution from CBS. Padell is an accountant and an attorney, and serves as business manager for a number of his clients. As a business manager, Padell suggests investments to, tends to the business affairs of, and prepares the tax returns for his clients. Padell is not an expert on music or master recordings. Padell had been petitioner's accountant and financial advisor for several years prior to the year in issue. Sometime in 1977, Padell became petitioner's business manager. Padell recommended the acquisition of a master recording to petitioner. He did not suggest any other investments to petitioner. Padell explained the investment to petitioner in a five minute conversation. Petitioner relied on Padell's advice in deciding to purchase a master recording. On May 31, 1977, petitioner executed an agreement with C.C. Records, N.V. ("C.C."), by which he acquired the rights to a master recording. At the time Snyder executed the purchase agreement, C.C. was a recently formed corporation located in Curacao. *626 Petitioner acquired a master recording titled "Global Considerations", by a recording group named in the agreement as Antiquity, in exchange for a stated purchase price of $100,000.00. Petitioner tendered payment by means of $10,000.00 cash and a nonrecourse note for $90,000.00. In addition, he executed a security agreement with C.C. which provided that the master recording was the only security for the nonrecourse note. Petitioner also executed a distribution agreement with K-Mann Records, Ltd. ("K-Mann") on May 31, 1977. At the time the distribution agreement was executed, K-Mann was a recently-formed corporation under the jurisdiction of the British West Indies.Petitioner had no knowledge of and no contact with K-Mann prior to this transaction. Petitioner did not read or review the distribution agreement before executing it. In Paragraph 2, the distribution agreement provides K-Mann with the "perpetual right" to distribute records made from the master and to use the likenesses and related information of those individuals whose performances are embodied on the master recording. Paragraph 3, however, provides that the term of the agreement is three years. These discrepancies *627 are inexplicable. The agreement gives the distributor 75 percent of the net profits, and sets forth a lengthy discussion of the terms for payment of the nonrecourse note by K-Mann with Snyder's 25 percent share of the net profits. These profit terms were not in accordance with standard industry practice in 1977. The distribution agreement does not discuss the price of the master recording in album, single, tape or cassette form. There is no discussion of singles distribution. The agreement does not set forth a return policy. These concerns are specifically addressed by standard distribution agreements. Petitioner entered into this transaction without listening to a copy of the master recording, reviewing any appraisals of the recording, or reading the prospectus. Snyder had no idea how many records would have to be sold before he made a profit. In recommending this investment, Padell relied primarily upon the involvement of the law firm of Pryor Cashman Sherman and Flynn and its tax counsel Richard Osserman ("Osserman"). At the time petitioner made his purchase, Padell knew that one of C.C.'s principals was Osserman's brother. Padell's firm negotiated with C.C. in an attempt *628 to receive commissions on the master recordings acquired by clients of Padell's firm. Padell does not remember listening to a copy of the master recording before recommending it to petitioner. Padell also relied on the analysis of the tax aspects of the prospectus performed by his partner Jacob Fine ("Fine"). The prospectus advises prospective purchasers that the record industry is very competitive, and that effective publicity and reliable distribution are essential. The prospectus states that the distributor has had no prior experience with the distribution of records. The prospectus does not discuss the use of mail order sales. The prospectus also states that "[s]ales substantially greater than the industry average must be earned in order for the purchaser to recover his investment." The prospectus further states that sales of approximately 60,000 albums will be required to pay the principal of the note, additional sales would be required to meet interest payments, and that relatively few recordings generate sales in excess of 60,000 albums. The prospectus notes that: "[o]nly a small percentage of all records generate a profit to their owners. Accordingly, there is *629 a substantial degree of risk that exploitation of a master recording will not yield profits to the purchaser." A large portion of the prospectus is devoted to a discussion of the tax aspects *454 of the proposed transaction. It warns of possible challenges by respondent due to the highly leveraged nature f the transaction. Petitioner has considerable experience in the record industry. He left CBS and formed Cleveland, his own record company. Petitioner spent most of the latter half of 1977 travelling extensively for Cleveland and promoting the successful "Bat Out of Hell" album by Meatloaf. Petitioner considered radio airplay important in gaining acceptance for an album, and visited radio stations as well as retailers, wholesalers and CBS personnel in his efforts to promote Meatloaf. Petitioner made no effort to promote "Global Considerations" in this manner. K-Mann distributed "Global Considerations" by mail order. Petitioner received periodic reports from K-Man alleging sales of the album had occurred, and claiming that amounts were paid to C.C. in partial satisfaction of petitioner's indebtedness. Petitioner forwarded correspondence from C.C. and K-Mann to Padell. *630 In one letter, K-Mann claimed that "Global Considerations" was manufactured and distributed in the United States, and would continue to be distributed primarily in the United States. Petitioner did not pay much attention to the reports. When petitioner was informed that the album had not reached its level of guaranteed sales, he did not consider changing marketing plans. He never received any money from "Global Considerations." Petitioner presented no receipts, delivery statements, cancelled checks or testimony to show that the sales alleged by K-Mann had actually occurred. Under the terms of the distribution agreement, album sales of "Global Considerations" would have had to total approximately 100,000 units in 1978 and 1979 to have produced the gross receipts reported to petitioner by K-Mann. Respondent's expert, John Wiedenmann ("Wiedenmann") testified that the industry journals Billboard, Rolling Stone and Phonlog had no listing of Antiquity ever having released a record. Billboard publishes charts covering every international country of importance, and "Global Considerations" never appeared on any of its charts. A record selling 100,000 units would make the charts. We find *631 that the periodic statements received by petitioner from K-Mann were fabrications. Thus, notwithstanding the reports sent to him, petitioner neither actually nor constructively received any income from the master recording. The "Global Considerations" album is a recording of unknown material by an unknown group. There are surface noises on the recording. Technically, this album must be classified as substandard. Because of the poor technical quality of the album, there is little change that radio station exposure could be obtained. The record jacket is poorly designed. It consists of a universal jacket with printing "dropped" on it. There is no original artwork. The jacket fails to describe the type of music performed or the background of the group. Given the fact that Antiquity is an unknown group, these are serious omissions. Wiedenmann testified that the master recording was commercially worthless in 1977. We found Wiedenmann a credible, unbiased and well qualified witness. [2] Petitioner failed to present any expert testimony or evidence as to the value of the recording. His own testimony was selfserving. Moreover, though petitioner has expertise in record marketing, *632 he has no qualifications to value master recordings. In adddition, because of its poor technical and packaging qualities, this record could not be successfully promoted. Taking all these factors into consideration, the fair market value of the "Global Considerations" master recording was de minimis in 1977. Petitioner did not receive any income from his master recording in 1977. On his 1977 return, he claimed depreciation and an investment tax credit using a depreciable basis of $100,000.00. On his 1978, 1979 and 1980 returns, petitioner reported gross receipts from album sales and claimed interest and depreciation deductions. In 1981, petitioner did not report any receipts or claim any deductions with respect to the master recording. In his notice of deficiency, respondent disallowed petitioner's claims on his 1977 return for a depreciation deduction and investment tax credit. *455 Opinion At issue in this case are the deductions and credit claimed by petitioner *633 as a result of his purchase of the master recording "Global Considerations." [3] Respondent purports to disallow these deductions and credit on a variety of grounds. We choose to begin by addressing the issue of whether the $90,000 nonrecourse note from Snyder should be included in the basis of his rights in the master recording. In Estate of Baron v. Commissioner, 83 T.C. 542 (1984), the taxpayer purchased a master recording and claimed depreciation deductions based on a $90,000 cash payment and a $460,000 nonrecourse note. This Court found that the obligation on the note was too contingent to be includable in the taxpayer's basis. Payments on the note were to be made solely from gross receipts from the recording. We found that the likelihood *634 of public acceptance for the artists involved was not established, and that the value of the rights in the recording lay solely in the anticipated income stream derived from public acceptance. We stated that: Under these circumstances, there was no incentive for Sydney Baron to pay the note out of his other funds in order to preserve valuable property -- an element which the courts have found compelling in other cases involving nonrecourse obligations. * * * Under these circumstances, the amount of $460,000 represented by the nonrecourse note may not be included in Sydney Baron's basis. [Footnotes omitted; Estate of Baron v. Commissioner, supra at 552]. The facts in the instant case are similar to those in Estate of Baron. Petitioner purchased "Global Considerations" for $10,000 cash and a $90,000 nonrecourse note. The payments on the note were to be made only from petitioner's gross receipts from sales of the album. There was no likelihood of public acceptance of the album. Every witness at the trial of the instant case testified that the record business is highly speculative, and that it is difficult to predict the success and public acceptance of a record *635 before its release. The group Antiquity was unknown to the general public. The personalities involved in "Global Considerations" had not achieved such status as would permit us to view them in the same way we might view an established recording artist whose stature practically guaranteed that his or her recording, regardless of its quality, would hit the charts. Applying the contingency principles and considerations outlined in Estate of Baron, we think it clear that the $90,000 nonrecourse note in the instant case was too contingent to be includible in petitioner's basis. A further ground for our decision to exclude the nonrecourse note from petitioner's depreciable basis is that the purchase price and the amount of the note unreasonably exceeded the fair market value of the rights in the master recording [4] that secured the payment of the note. *636 It is well settled that depreciation is based upon actual investment in property rather than upon mere legal title. Narver v. Commissioner [Dec. 37,335], 75 T.C. 53, 98 (1980), affd. per curiam in an unpublished opinion [82-1 USTC P9265] 690 F. 2d 855 (9th Cir. 1982). No such actual investment exists to the extent of the amount of the nonrecourse note where the purchase price of the property and the amount of the note unreasonably exceed the fair market value of the property. Estate of Franklin v. Commissioner [76-2 USTC P9773], 544 F. 2d 1045 (9th Cir. 1976), affg. [Dec. 33,359] 64 T.C. 752 (1975). When there is no "genuine indebtedness," the amount of the nonrecourse note is not included in the basis of property. Brannen v. Commissioner [84-1 USTC P9144], 722 F. 2d 695 (11th Cir. 1984), affg. [Dec. 38,897] 78 T.C. 471 (1982). Odend'hal v. Commissioner [Dec. 39,992], 80 T.C. 588, 604 (1983), affd. on this issue [84-2 USTC P9963]     F. 2d     (4th Cir. 1984); Siegel v. Commissioner [Dec. 38,962], 78 T.C. 659 (1982). This Court has noted *637 the applicability of this principle to a master recording transaction. Flowers v. Commissioner [Dec. 40,112], 80 T.C. 914, 937 (1983). *456 In the instant case, we have found as a fact that the fair market value of "Global Considerations" was de minimis at the time the recording was acquired by petitioner. The purchase price and the principal amount of the note unreasonably exceeded the value of the recording. Thus, the note does not constitute "genuine indebtedness," and is not includible in petitioner's depreciable basis in the master recording. We now turn to the question of whether Snyder's acquisition and holding of the rights in the master recording during 1977 constituted, under section 183 [5] an "activity not engaged in for profit" [6]
*638 Sections 162 and 212(1) and (2) permit full deduction of all ordinary and necessary expenses paid or incurred in carrying on a trade or busines or in the production of income. However, an activity does not rise to the level of the carrying on of a trade or business under section 162(a) nor are expenses incurred for the production of income under section 212(1) or (2) unless the activity is engaged in with the objective of realizing a profit. Brannen v. Commissioner, supra, 78 T.C. at 499. Where not engaged in for profit, section 183 provides that deduction of expenses is essentially limited by the amount of income generated by the activity. To fully deduct expenses under section 162 or 212, therefore, an individual must be prepared to demonstrate an associated profit motive. A similar analysis is applicable with respect to the investment tax credit. Flowers v. Commissioner, supra at 931. The credit is only available on property that is depreciable and has a useful life of at least three years.Section 48(a)(1). Thus, if property cannot be depreciated because it was not used in a trade or business, or was not held for the production of income it cannot *639 give rise to investment tax credit. Pike v. Commissioner [Dec. 39,037], 78 T.C. 822, 841-842 (1982). Whether an activity is engaged in for profit turns on whether the taxpayer has a bona fide objective of making a profit. Dreicer v. Commissioner [Dec. 38,948], 78 T.C. 642, 643-645 (1982), affd. without opinion 702 F. 2d 1205 (D.C Cir. 1983); Engdahl v. Commissioner [Dec. 36,167], 72 T.C. 659, 666 (1979); Golanty v. Commissioner [Dec. 36,111], 72 T.C. 411, 425-426 (1979), affd. without opinion 647 F. 2d 170 (9th Cir. 1981). Profit objective is a question of fact to be determined from all the facts and circumstances. Dunn v. Commissioner [Dec. 35,353], 70 T.C. 715, 720 (1978), affd. [80-1 USTC P9187] 615 F. 2d 578 (2d Cir. 1980). The burden of proof is upon the taxpayer, ( Surloff v. Commissioner [Dec. 40,419], 81 T.C. 210, 233 (1983); Rule 142(a)), with greater weight placed upon objective facts than upon mere statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Churchman v. Commissioner [Dec. 34,559], 68 T.C. 696, 701 (1977). In *640 carrying this burden the taxpayer need not demonstrate that his expectation of profits was reasonable, but only that he held an actual, and honest profit objective. Allen v. Commissioner [Dec. 35,977], 72 T.C. 28, 33 (1979). The regulations under section 183 identify 9 factors, derived from prior case law, which are to be considered in determining whether the requisite profit motive is present. The factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Section 1.183-2(b), Income Tax Regs. In deciding whether the requisite profit motive exists in any case, the presence of one, or even a majority, of these *641 factors is not *457 determinative. Benz v. Commissioner [Dec. 32,880], 63 T.C. 375 (1974); Golanty v. Commissioner, supra. Petitioner contends that when he purchased the master recording there was every indication that the album would be a success, that K-Mann made every effort to make "Global Considerations" a success, and that petitioner reasonably relied on Padell's advice and upon K-Mann to distribute the album in such a manner as to achieve maximum sales. Respondent argues that tax profit, rather than economic profit, motivated petitioner's acquisition and holding of the master recording. Numerous examples of petitioner's "unbusinesslike manner" in this transaction have been provided by respondent to illustrate what respondent believes was petitioner's lack of concern with making a profit on the album. There is little evidence that petitioner's decision to acquire the master recording was based upon the types of considerations that normally would be expected to influence a sincere investor. Petitioner did not listen to the album prior to his purchase. Padell, the advisor relied on by petitioner, cannot remember listening to the album *642 at that time. No appraisal of the master recording was obtained. Petitioner did not read the distribution agreement before signing it. The distribution agreement contains inexplicable discrepancies, and fails to address concerns specifically addressed by standard industry agreements. The profit terms in the distribution agreement were not in accordance with standard industry practice in 1977. Though he was experienced in the music business, petitioner relied on Padell to choose a master recording for him.Padell, however, was not an expert on music or master recordings. Padell relied on the involvement of a law firm and its tax partner in recommending the purchase to petitioner. He also relied on Fine's analysis of the tax aspects of the transaction. Given these circumstances, it is apparent that neither petitioner nor Padell had a basis upon which to make an informed investment decision. The presence of K-Mann in the deal certainly could not inspire confidence, since the company had no experience in the record industry, and only planned mail order distribution. Padell's motives for the endorsement of the purchase are suspect, since his firm was negotiating to receive a commission *643 on the recordings sold to clients. Furthermore, Padell relied on the involvement of Osserman, whose brother was known to be one of the principals of C.C. There is very little in the prospectus to inspire a belief that sales would ever be substantial. The prospectus warned that the record business is highly speculative and involves a substantial degree of risk. It stated that C.C. and K-Mann had no experience with the production and distribution of records. The prospectus explained the tax benefits that would accrue to purchasers if the tax treatment were not successfully challenged by respondent. The prospectus warned of the risk that respondent would attempt to disallow a substantial portion of the deductions. The prospectus noted that sales "substantially greater than the industry average" must occur for a purchaser to recover his costs. It estimated that 60,000 albums must be sold simply to cover principal payments on the note, and acknowledged that few records generate sales in excess of 60,000 albums. Taken as a whole, the prospectus accentuated the beneficial tax consequences, and the concurrent risks, while affording little hope for a potential return from the album *644 purchased. We found as a fact that the fair market value of "Global Considerations" was de minimis at the time it was acquired by petitioner. A purchase price that is inflated by nonrecourse indebtedness raises serious questions about the motives of the acquiring party, since the presence of nonrecourse indebtedness creates the potential for "shenanigans." See Flowers v. Commissioner, supra at 937; Ramsay v. Commissioner [Dec. 41,635], 83 T.C. -- (November 27, 1984). In 1977, petitioner was actively promoting the "Bat Out of Hell" album. Petitioner made no such efforts to promote "Global Considerations." K-Mann's efforts were limited to mail order, and petitioner presented no evidence to show that the company ever actively promoted the album. Generally radio airplay is estremely important to the success of an album. Petitioner presented no evidence to show K-Mann seriously attempted to gain airplay for "Global Considerations." By contrast, petitioner travelled extensively, visiting many radio stations to solicit airplay for the Meatloaf album. *458 We found as a fact that the income statements petitioner received from K-Mann were fabrications. We reject *645 petitioner's attempt to show a bona fide operation by his reliance on these reports. Petitioner does not contest the fact that approximately 100,000 albums must have been sold to generate the amounts reported by K-Mann. It is not possible that an album could achieve such success and not make the charts in Billboard. It appears that these reports were created to add verisimilitude to the transaction and present a facade of profitability. Thus, there is no credible evidence that K-Mann ever had any measure of success in distributing "Global Considerations." Petitioner's supervision of the master recording was minimal. He received the reports from K-Mann, and gave them to Padell. Similarly, Padell's involvement subsequent to the acquisition of the recording was passive and at most consisted of a few phone calls to Osserman, who was a tax lawyer, and not a principal of either C.C. or K-Mann. Neither petitioner nor Padell took any action when K-Mann reported that the album had not reached its level of guaranteed sales. Petitioner has failed to show that he entered into the purchase of the master recording with any genuine business purpose or concerns other than that of obtaining *646 large deductions and credits at a small out-of-pocket cost. No one with expertise evaluated the master recording, and Padell's recommendation of the recording was based on tax considerations. Petitioner's failure to act and exercise his ownership rights cannot be reconciled with his alleged profit motive. The contrast between petitioner's activities to promote Meatloaf's album and the effort expended to promote "Global Considerations" highlights the lack of profit objective in the instant case. The inflated indebtedness and fabricated reports of earnings further illustrate that the purchase and holding of the recording was motivated by a desire to gain the greatest deductions possible, and to provide a line of defense on profitability if attacked by respondent. It is clear that petitioner acquired the master recording solely for the purpose of reducing his tax burdens, and we hold that the transaction was entered into and carried out with a complete indifference to profit. Under section 183, petitioner's deductions for 1977 are limited by the income received from the activity. Petitioner had no earnings from "Global Considerations" in 1977. Thus, petitioner may not claim either *647 depreciation deductions or investment tax credit for the taxable year 1977. Accordingly, we need not address respondent's alternative arguments. We have considered petitioner's other arguments and find them unpersuasive. [7]
In conclusion, it is apparent from the overall record of this case that petitioner was a party to an abusive tax shelter. This type of arrangement disparages good tax planning and denigrates both the Congressional purpose inherent in the credits and deductions which we here disallow and our national tax system. Petitioner knew, or reasonably should have known, this when he agreed to participate in this specious stratagem of tax illusion. Petitioner, and those like him, who exchange small cash amounts for large tax deductions because of pie-in-the-sky nonrecourse transactions arranged to jack up basis without underlying economic substance or enterpreneural risk may become subject to consequences unanticipated by the parties. See Barnard v. Commissioner [84-1 USTC P9372], 731 F.2d 230 (4th Cir. 1984), affg. *648 Fox v. Commissioner [Dec. 40,125], 80 T.C. 972 (1983). To reflect the foregoing, decision will be entered for the respondent. Footnotes
1. Petitioner Jerry Snyder is a party to this action only by virtue of having filed a joint return in 1977 with her husband petitioner Stanford Snyder. Therefore, "petitioner" in the singular form hereinafter refers to petitioner Stanford Snyder.↩
2. Petitioner alleged that Wiedenmann was biased and incompetent. We reject petitioner's allegations based on our observation of Wiedenmann and our appreciation of the depth and breath of his experience.↩
3. Although at trial we held the burden of proof rested upon respondent only as to the issue of the sueful life of the recording, petitioner asserts on brief that respondent has assumed the burden of proof on all issues other than profit motive. We need not consider this argument, because the trial testimony, stipulated facts and documentary evidence provide a sound basis for our decision regardless of where the burden lies.↩
4. See Brannen v. Commissioner [84-1 USTI P9144], 722 F. 2d 695, 701 and n. 3 (11th Cir. 1984), affg. [Dec. 38,894] 78 T.C. 471 (1982); Estate of Baron, supra at note 26. Since the recording's fair market value has no relationship either to the amount of the note or to the purchase price, we need not decide which test should apply. See also Fuchs v. Commissioner [Dec. 41,349], 83 T.C. 79, 101-102↩ (1984).
5. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year at issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
6. Section 183(a) provides that "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) allows those deductions which would be allowable without regard to whether or not such activity is engaged in for profit. Section 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."↩
7. Among other arguments, we specifically considered and rejected petitioner's contention that section 183 is not applicable to him.↩