MARTIN P. GOLDEN AND REGINA GOLDEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Golden v. Commissioner
Docket No. 21693-84
United States Tax Court
T.C. Memo 1989-514; 1989 Tax Ct. Memo LEXIS 514; 58 T.C.M. (CCH) 185; T.C.M. (RIA) 89514; September 25, 1989; As corrected September 26, 1989 *514 Petitioner husband was a limited partner in a partnership formed to purchase the rights to certain computer software designed for internal management by small school districts and to market the software to the school districts. Petitioners claimed depreciation and investment credit for the software on their tax return. Held: (1) The partnership did not engage in a trade or business with an actual and honest objective of making a profit. (2) Petitioners are not entitled to claim depreciation or investment credit for the computer software. (3) Substantially all of the resulting deficiency is an underpayment attributable to a tax motivated transaction. Sec. 6621(c), I.R.C. 1954 and 1986. Martin P. Golden, pro se. Sandra M. Gilmore, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION
CHABOT, Judge: Respondent determined a deficiency in Federal individual income tax against petitioners for 1980 in the amount of $ 7,702.06. By amendment to answer, respondent asserts that petitioners are liable for an increased rate of interest under section 6621(c), [1] on account of a substantial underpayment attributable to a tax motivated transaction. By amendment to petition, petitioners *515 asked for an increased depreciation deduction in the amount of $ 2,878.60 as additional first-year depreciation under section 179. The issues for decision are as follows: (1) Whether petitioner husband's proportionate share of a depreciation deduction and investment credit claimed for certain computer software by the limited partnership, United School Systems, Ltd. (hereinafter sometimes referred to as "the Systems Partnership"), of which petitioner husband was a member, are not allowable for 1980 because the Systems Partnership did not have a profit objective when it entered into the computer software business; or (2) Whether the depreciation *516 deduction and investment credit are not allowable for 1980 because as of December 31, 1980, the Systems Partnership was not actually engaged in a trade or business but was merely preparing to engage in a trade or business; or (3) Whether the depreciation deduction and investment credit are not allowable for 1980 because the computer software was not "placed in service" as of December 31, 1980; or (4) Whether investment credit on the computer software is not allowable because the computer software is intangible personal property; and, alternatively, (5) Whether any portion of a nonrecourse note used to finance the acquisition of the computer software may be included in its basis for purposes of computing depreciation and investment credit; and (6) Whether petitioners may claim additional first year depreciation for the computer software; and (7) Whether petitioner husband's investment in the Systems Partnership generated a substantial underpayment of tax attributable to a tax motivated transaction within the meaning of section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When *517 the petition was filed in the instant case, petitioners Martin P. Golden (hereinafter sometimes referred to as "Golden") and Regina Golden, husband and wife, resided in Hamburg, New York. During 1980, Golden was employed as an engineer by Westinghouse Electric Corporation of Pittsburgh, Pennsylvania. He also was an investor in commodities futures and was a client of Western Financial Management (hereinafter sometimes referred to as "the Management Partnership"), a partnership formed in 1976 by Charles R. Rietz (hereinafter sometimes referred to as "Rietz") to sell commodities futures. Sometime in 1980, the Management Partnership contacted some or all of its clients, including Golden, regarding the possibility of participating in the Systems Partnership. The Systems Partnership was a California limited partnership formed to buy certain computer software (hereinafter sometimes referred to as "the Computer Software") and to market Computer Software to the public. On December 18, 1980, Rietz sent to potential investors a copy of the summary and preliminary proposal (hereinafter sometimes referred to as "the Summary") of the Systems Partnership offering. The Summary describes the business *518 history of, and principals involved in, the Systems Partnership as follows: MAYNARD PROGRAMMING SERVICE LTD. -- Software development and programming COMPUTER SUPERMARKET, INC. -- Computer hardware and software marketing company WESTERN FINANCIAL MANAGEMENT -- Agent for and consultant to Maynard
Joseph Maynard has an extensive background in computer software design and programming. He was employed in 1979 by Computer Supermarket, which heretofore has specialized in packaging and marketing computer systems to the health care industry. Computer Supermarket has conducted a study of the marketability of a computer software package for management of small school districts. Small school districts (enrollment less than 10,000) have not been able to afford computerization of records management. Such data management systems as have been available for school districts generally cost $ 250,000 or more. The recent technology of mini-computers has made it possible to reduce the prices of such systems to the range of $ 60-100,000. Only a few companies are competing for this business, and they are making substantial profits . Computer Supermarket's study has confirmed that there is a need for *519 a system which is more competitively priced and more capable. Consequently [sic] the company made the decision to compete for a share of this lucrative market where only a few competitors are making high profits. Computer Supermarket had located a small-school-district management system designed by Don Stephens, Data Processign [sic] Director over 8 years for a major So. Cal. school system. This system is, in their opinion, superior to all coparable [sic] software currently available. At the request of Computer Supermarket, Mr. Maynard negotiated to purchase the software design and undertook to fully develop and program the software. He then approached Charles R. Rietz, President of Western Financial Management to obtain financing to complete the actual programming and preparation of the master software package. Mr. Rietz negotiated a marketing contract with Computer Supermarket which requires payment of a substantial royalty to the owner of the master software package upon sales of copies of it and awards CS exclusive marketing rights in return for its meeting certain minimum requirement for numbers of systems sold. Maynard agreed to sell the system to a prospective buyer for *520 price and terms based upon the income projected from the minimum fulfillment of the CS marketing contract. Mr. Rietz agreed to act as exclusive sales agent and consultant for Maynard and to structure and negotiate a sale and terms on behalf of Maynard as well as locate a buyer. Maynard shall pay WFM a commission for these services. A limited partnership was proposed to purchase the master software package for the price and terms listed above. [The details of the price and terms are described infra.] The General Partner will be Mr. Robert Castle, President of Computer Supermarket. The proposed limited partners will be clients and contacts of [The Management Partnership]. Maynard will also contract to maintain the software and update it to prevent obsolescence during the term of the purchase note. [Emphasis in original.] According to the Summary, "A market study was conducted to determine the size of the market, competition, existing technology, market potential, market breakdown, market statistics, etc." Readers are invited to see an attached summary of the market study. Neither the market study nor a summary of the market study were made a part of the Summary or introduced into *521 the record at trial. No independent appraisal was obtained to determine the fair market value of the Computer Software. The Summary emphasizes the tax advantages of the investment. Potential investors are advised that the initial tax savings are 200 percent of invested dollars; depreciation results in tax-sheltered income; and investment credit, the main source of the tax benefits, provides a dollar-for-dollar credit against tax obligations, is not subject to the "at-risk" rules, and has virtually no recapture when the subject asset is held for business use for at least 7 years as proposed. The Summary also projects the profit potential of the investment to be 15 to 120 percent plus annual net cash return which would be derived from royalty income from exploitation of the master computer software package. According to the sales projection included in the Summary (hereinafter sometimes referred to as "the Sales Projection"), the total market of school districts with fewer than 10,000 enrollment in California was 1,000 out of 1,100 in the State (or 90 percent). Nationwide, total school districts with enrollment of less than 10,000 was estimated to be 20,000. (The record does not *522 indicate the source of the market projections or their accuracy.) The Sales Projection estimates the return on capital for the 10-year period of the nonrecourse promissory note (the details of which are described infra) to be as shown in table 1. Table 1 Year
Year
Years
1
2
3-10
per year
(Minimum)
Units to be sold
6    21    41    Royalty to Partnership
$ 127,200 $ 445,200 $ 869,200 Minimum payment on note
(90% of royalty)
Principal *
-0-   -0-   (779,966)
Interest
(114,480)
(400,680)
(2,314)
Adjusted cash income
$  12,720 $  44,520 $  86,920 Admin. and bookkeeping
($ 500 per mo.)
(6,000)
(6,000)
(6,000)
Maintenance contract
-0-   (6,000)
(6,000)
($ 500 per mo.)
Net distributable cash
$   6,720 $  32,520 $  74,920 99% to Limited Partners,
$   6,653 $  32,195 $  67,428 1st 2 yrs; thereafter,
90% if royalty at least
$ 866.628
% Return on $ 300,000 capital
2.2%
10.7%
22%
Year
Years
Year
3
4-5
6
per year
(Better than Minimum)
Units to be sold
41    48    48    Royalty to Partnership
$ 869,200
$ 1,017,600 $ 1,017,600 Minimum payment on note
(90% of royalty)
Principal *
(779,966)
(779,966)
(779,966)
Interest
(2,314)
(135,874)
(134,178)
Adjusted cash income
$  86,920 $   101,760 $   103,456 Admin. and bookkeeping
($ 500 per mo.)
(6,000)
(6,000)
(6,000)
Maintenance contract
(6,000)
(6,000)
(6,000)
($ 500 per mo.)
Net distributable cash
$  74,920 $    89,760 $    91,456 99% to Limited Partners,
$  67,428 $    80,784 $    82,310 1st 2 yrs; thereafter,
90% if royalty at least
$ 866.628
% Return on $ 300,000 capital
22%
26%
27%
*523 Years
7-10
per year
Units to be sold
48    Royalty to Partnership
$ 1,017,600 Minimum payment on note
(90% of royalty)
Principal *
(779,966)
Interest
-0-  Adjusted cash income
$   237,643 Admin. and bookkeeping
($ 500 per mo.)
(6,000)
Maintenance contract
(6,000)
($ 500 per mo.)
Net distributable cash
$   225,634 99% to Limited Partners,
$   203,070 1st 2 yrs; thereafter,
90% if royalty at least
$ 866.628
% Return on $ 300,000 capital
68%
The Sales Projection contains the following warning: This Sales Projection illustrates that the royalties to be received by the Partnership as Computer Supermarket fulfills its exclusive marketing contract requirements would be more than sufficient to amortize the note in ten years; HOWEVER, THERE CANNOT BE ANY GUARANTEE THAT COMPUTER SUPERMARKET WILL MEET EVEN ITS MINIMUM COMMITMENT. THIS PROJECTION IS INTENDED ONLY TO PROVIDE A REASONABLE ILLUSTRATION OF INCOME POTENTIAL. [Emphasis in original.]
On or about December 18, 1980, Rietz sent a copy of the private placement memorandum for the Systems Partnership to potential investors. The letter *524 forwarding the copy of the private placement memorandum advises potential investors that time is of the essence and that the investor should confirm his or her subscription within 5 days because: We have much greater demand than supply! The offering is only $ 300,000, and the total of requests for positions received to date by our associates is more than twice that amount. And there are new requests still coming in! The only appropriate way to handle this problem is to accept participations ONLY IN THE ORDER IN WHICH FULL MONEY AND SUBSCRIPTION DOCUMENTS ARE RECEIVED -- FIRST-COME, FIRST-SERVED. [Emphasis in original.] The accompanying instructions for subscription advise potential investors to read the Systems Partnership's Summary "To get an overview of the purpose of the [Systems Partnership], the projected income potential, and the tax advantages." Investors further are advised to read the private placement memorandum and to discuss "the tax aspects of the offering with your tax counsel (attorney, or CPA, etc)" or to have their offering representative (attorney, CPA, or business consultant) review the memorandum. The instructions remind potential investors that the minimum investment *525 is $ 5,000, with $ 1,000 increments, and that an investor's subscription would not be accepted without an equivalent investment in that investor's Managed Commodity Account with the Management Partnership. The private placement memorandum describes the business of the Systems Partnership as follows: The Partnership will purchase all right, title and interest in and to certain computer software, which is, at present, partially completed and is more completely described in Exhibit C to this Memorandum. The Partnership then intends to enter into an exclusive agreement with Computer Supermarket, Inc., a California corporation of which the General Partner is president and sole shareholder, to market the software. The Partnership will derive its revenues from royalty payments to be received from Computer Supermarket pursuant to a schedule established in the Marketing Agreement between the Partnership and Computer Supermarket. * * * According to the private placement memorandum, 300 units of limited partnership interests were available at $ 1,000 per unit for a total of $ 300,000. The minimum investment was five units. All of the 300 units had to be sold before the Systems Partnership could *526 begin operations, and the subscriptions had to be received by December 30, 1980. The $ 300,000 was to be used as shown in table 2. Table 2 Purchase of computer software
$ 270,000
Initial management fee
10,000
Legal, accounting, printing,
and miscellaneous organizational
expense
12,000
Operating reserve
8,000
Total
$ 300,000
(The record does not show when all 300 partnership units were sold.) The offering was not registered with the United States Securities and Exchange Commission or with any State. The private placement memorandum warns that: THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK. THE TRANSFERABILITY OF THE UNITS IS RESTRICTED, THERE IS NO PUBLIC MARKET FOR THE UNITS BEING OFFERED HEREBY AND NONE WILL DEVELOP. * * * THE UNITS SHOULD BE PURCHASED FOR LONG TERM INVESTMENT ONLY. THE GENERAL PARTNER AND CERTAIN AFFILIATES WILL RECEIVE FEES IN CONNECTION WITH THE OFFERING AND THERE ARE CERTAIN CONFLICTS OF INTEREST. * * * According to the private placement memorandum, the limited partnership units are -- being offered only to sophisticated investors who can evaluate and afford the risks of this offering, and who have a net worth of at least $ 50,000 excluding home, furniture and personal *527 automobile (if a corporation, on a consolidated basis according to its most recent financial statement); or, in the alternative, have a net worth of at least $ 25,000 excluding home, furniture and personal automobile, and had during the last taxable year (or estimate that they will have during the current taxable year) taxable income, in excess of $ 25,000. * * * Five pages of the private placement memorandum describe risk factors involved in the limited partnership investment. Almost two-thirds of the text relating to these risk factors pertain to Federal income taxes. One of the attachments to the private placement memorandum is a 30-page tax opinion letter dated December 12, 1980, written by F. Richard Losey (hereinafter sometimes referred to as "Losey"). In this letter, Losey sets forth his opinion about certain of the Federal income tax considerations incident to the formation and conduct of the Systems Partnership and the acquisition and marketing of the computer software. According to the tax opinion letter: "Because [the Systems Partnership's] debt to Maynard is nonrecourse in nature and is secured only by a security interest in property to be used in its trade or business, *528 the partners in [the Systems Partnership] are initially 'at risk' only to the extent of their actual respective cash investments therein." The letter further states that the conclusion as to the "at risk" provisions "does not govern the availability of investment tax credit * * * ." The tax opinion letter warns that -- We, of course, can express no opinion respecting the fair market value of the software. SeeTreas. Reg. [sec.] 1.1001-1(a) ("The fair market value of property is a question of fact . . .") Because critical matters of fact are beyond the scope of our expertise, we can express no opinion respecting the cost of the software properly includible in its basis for purposes of the investment tax credit. If [the Systems Partnership] can prove that the purchase price for the software is in fact its fair market value, then the Maynard debt will constitute part of the cost therefor and the basis of the software for purposes of the investment tax credit will include the Maynard debt. We note that this transaction is within the parameters of favorable case law, but we point out that the amount of the credit in relation to the amount actually invested by the partners is almost certain *529 to result in an audit by the [Internal Revenue] Service. While [the Systems Partnership] should, assuming it can prove the facts related to us, have some strong legal arguments to support its contention respecting the basis of the software, we cannot predict the outcome of an audit. According to the private placement memorandum, Robert Castle (hereinafter sometimes referred to as "Castle"), the general partner, had been in the computer industry for about 15 years, in the last 5 of which he was dealing with the medical industry; he was president and sole shareholder of Computer Supermarket, Inc. (hereinafter sometimes referred to as "Computer Supermarket"), a corporation formed 3 years earlier to market to the health care industry. According to the private placement memorandum, Castle also was a general partner of Professional Software Marketing, Ltd. (hereinafter sometimes referred to as "Professional Software"), a limited partnership engaged in the business of marketing software to doctors, dentists, and veterinarians. As compensation for his services as general partner, Castle was to receive an initial management fee of $ 10,000 plus continuing management and administrative fees *530 of $ 500 per month, and 1 percent of all distributable net revenues (increased to 10 percent of all distributable cash after the Systems Partnership received $ 869,200 or more of gross revenue in any 1 year). In 1977, Joseph S. Maynard, Jr. (hereinafter sometimes referred to as "Maynard"), founded Maynard Programming Services, Ltd. (hereinafter sometimes referred to as "Maynard Programming"), to provide computer services. On December 31, 1980, Castle entered into a purchase agreement (hereinafter sometimes referred to as "the Purchase Agreement"), on behalf of the Systems Partnership with Maynard, on behalf of Maynard Programming, to acquire the Computer Software for $ 5,400,000. According to the private placement memorandum, Maynard had a degree in Applied Mathematics and Computer Science and had 11 years of programming experience with various companies, including Rockwell International; Market Compilation and Research Bureau of North Hollywood, California; Western Direct Marketing, Inc.; and Lucky Stores, Inc. The private placement memorandum states that before the execution of the Purchase Agreement, Maynard had been involved in the design and writing of the Computer Software. *531 Under the Purchase Agreement, Maynard Programming as "Seller" warranted that the Computer Software would be fully operable on or before December 31, 1980, and that "he [presumably, Maynard] has sufficient experience and competence to successfully complete the development of the Software on or before December 30, 1980. Seller represents that he will devote all of his time and talent to the completion of the Software by December 31, 1980, and that he will employ additional computer programmers as he deems necessary in order to meet such deadline." [2] Maynard Programming also warranted that for a 1-year period from December 31, 1980, "all of the programs will function properly for the purposes for which they are intended." Under the Purchase Agreement, the Systems Partnership *532 was to pay to Maynard Programming $ 270,000 in cash on closing of the purchase and execute a 9-percent, nonrecourse promissory note for the $ 5,130,000 balance of the purchase price. Castle, Maynard, and Rietz determined the value of the Computer Software based on income potential. Under the nonrecourse promissory note executed by Castle on December 31, 1980, [3] the $ 5,130,000 balance of the purchase price is payable over 10 years as follows: (1) During the first 2 years, beginning January 1, 1981, 90 percent of the Systems Partnership's gross monthly revenues in each month, up to a maximum of $ 779,966 for the year; [4] *533 (2) During each of the years 3 through 9, 90 percent of the gross monthly revenues in each month, up to a maximum of $ 779,966 for each year, but in no event less than $ 461,700 for any year, and in addition, for years 5 through 9, 5 percent of the remaining principal balance each year; (3) During the tenth year, 90 percent of the gross monthly revenues in each month up to a maximum of the remaining balance of principal and interest on the note, but in no event less than the entire outstanding balance of principal and interest on the note by the end of the tenth year. The promissory note further provides that the Systems Partnership would be deemed in default if by December 31, 1983, or by December 31 of any succeeding year, the Systems Partnership failed to pay any of the minimum amounts (including the 5-percent amounts) required during that year. If the Systems Partnership failed to cure a default within a grace period of 12 months, then, under the promissory note, the whole sum of principal and interest would become immediately due at the option of the holder of the note. At the end of *534 the tenth year, the promissory note also could be extended at the option of the lender to pay any remaining accrued interest but only if all principal had been paid to date. The Computer Software was the only collateral for the promissory note. On December 31, 1980, the Systems Partnership and Maynard Programming also entered into a maintenance agreement [5] which provides for the maintenance of the Computer Software and assurance that the Computer Software would not become obsolete during the term of the promissory note. Under this maintenance agreement, the Systems Partnership agreed to pay Maynard Programming $ 500 per month beginning the first month of the second year from the date the Computer Software became available to the Systems Partnership, plus $ 30 per hour for each hour of actual services in excess of 16.67 hours rendered in any month (adjusted beginning in 1982 for increases in the Consumer Price Index). Also on December 31, 1980, Castle executed a marketing agreement [6] on behalf of both Computer Supermarket *535 (as its president) and the Systems Partnership (as its general partner). Under the marketing agreement, the Systems Partnership gave Computer Supermarket the exclusive right to market worldwide the Computer Software and the exclusive control of all activities and operations to promote and market the Computer Software. The record does not indicate the price at which the Computer Software would be sold; however, Computer Supermarket agreed to pay the Systems Partnership a royalty of $ 21,200 for each Computer Software sold. All other proceeds from the sale of the Computer Software were to be retained by Computer Supermarket. The marketing agreement was to remain in effect until December 31, 2000, or until Computer Supermarket failed to meet its monthly quotas of royalties, which were as shown in table 3. Table 3 Time Period
Royalties (Quota per Month)
1st 6 months
0           2nd 6 months
$ 127,200           3rd 6 months
$ 190,800           4th 6 months
$ 254,400           3rd - 10th years
$ 869,200 (per year)
thereafter
$  72,219 (per year)
*536 Under the marketing agreement, the contract with Computer Supermarket would automatically renew each year after December 31, 2000, unless either party cancelled the agreement by giving a 3-month written notice of its cancellation. Under the marketing agreement, "Upon the breach of any of the terms and conditions of this Agreement, or any act of misfeasance or malfeasance by either party, or, if either Computer Supermarket or the Partnership is dissolved or becomes involved in any insolvency proceeding, receivership, or bankruptcy proceeding, this Agreement may be terminated without notice or opportunity to cure, at the option of the aggrieved party." Under the Systems Partnership's certificate of limited partnership, the Systems Partnership would continue until December 31, 2000, or until the date on which: all property of the Systems Partnership was sold or disposed of, the Systems Partnership was voluntarily dissolved by agreement of the Partners, or the Systems Partnership was dissolved by operation of law or judicial decree. The business of the Systems Partnership would begin when $ 300,000 had been subscribed by the limited partners and released from escrow to the general partner. *537 All profits and losses of the Systems Partnership would be allocated 99 percent to the limited partners until the Systems Partnership received gross revenues in any year of $ 869,200, after which the profits and losses would be allocated 90 percent to the limited partners and 10 percent to the general partner. Under the certificate of limited partnership, a holder of a partnership unit had no further obligation to make contributions to the Systems Partnership once a unit had been paid in full. The Computer Software was to be application software designed for public schools. School districts would use the programs to account for courses and students. The software program would contain five sub-programs: initiation, file maintenance, and reporting; attendance; accounting; student master file update; and reporting and preregistration scheduling. The Computer Software program was to be designed in PASCAL, for use on the DC-PDP 11 type, 1123 micro-computer RT-11 operating system. No computer hardware was to be included. The Computer Software was to be designed to process, in a preprogrammed and systematic manner, information provided and input by the user (school authorities) on computer *538 hardware. The user had to have compatible existing hardware or purchase compatible hardware in order to use the Computer Software. The output, via peripheral hardware (such as a line printer), was to be various attendance reports, report cards, course schedules, and other matters which would display the user's information in predesigned formats. If no information was input into the program by the school district, then only blank reports would result. If the Computer Software was not compatible with the hardware used by the school district, then the application software program could not be used. All of the limited partners of the Systems Partnership were clients of the Management Partnership. The Systems Partnership had a total of 38 limited partners and one general partner. Golden had a 1.65 percent profit-sharing interest in the Systems Partnership. On December 31, 1980, the Management Partnership submitted a $ 5,000 check to the Systems Partnership on behalf of Golden as his investment in the Systems Partnership. That $ 5,000 was Golden's only cash out-of-pocket investment in the Systems Partnership. Golden did not obtain an independent appraisal of the fair market value of the *539 Computer Software. On or before March 17, 1981, Rietz decided to replace Castle as the Systems Partnership's general partner. In a letter to the limited partners dated March 17, 1981, to clarify the reasons for Castle's removal, Rietz reported the following: 1. The software purchased by the partnership was completed and "in service" on or before December 31, 1980, as stock in trade, with all right, title and interest owned by the partnership (see Tax Opinion, pages 2 and 3), and available to sell to schools to perform the functions outlined in the private placement. This qualifies the partnership for Investment Tax Credit and depreciation for 1980 on the software. [Emphasis in original.] The "Tax Opinion" referred to in the letter was not attached to the letter. In the letter, Rietz charged Castle with failing to send the Forms K-1 to the partners timely, hesitancy to sign the partnership tax returns, unresolvable disagreements with Maynard, and premature withdrawals of administrative fees. On the last point, Rietz stated that "We intend to pursue this -- legally if necessary -- on behalf of the partnership." In a letter to Golden dated March 14, 1981, which served as a substitute *540 Form K-1, Rietz informed Golden that his $ 5,000 investment in the Systems Partnership entitled him to an investment credit of $ 8,910 and a depreciation deduction of $ 2,121.40. Rietz's letter further states that: "The depreciation deduction fills the entire 'at-risk' quota for 1980; so the current 1980 expenses and the amortization of origanizational [sic] expenses will not come into the picture for 1980 but will be carried forward." On August 17, 1981, Rietz filed with respondent an application to extend the time to file the Systems Partnership's information return for 1980 until October 15, 1981. (Another extension had previously been granted.) Respondent granted the extension request on August 27, 1981. [7] The Systems Partnership did not file an information return for 1980. On April 16, 1982, Rietz filed [8] a Form 1065, U.S. Partnership Return *541 of Income, for the Systems Partnership for 1981 under the name "United States School System Lt". This information return does not report any gross receipts or income of any sort for the year; it reports total deductions of $ 543,159, of which $ 540,000 is claimed for depreciation. The depreciation schedule attached to the return shows as the sole depreciable asset of the Systems Partnership, the Computer Software which was acquired in September 1980 for a cost of $ 5,400,000. The depreciation deduction is calculated on the straight-line method, using a 10-year life. (The record does not explain why the information return shows a September 1980 acquisition date for the Computer Software or a September 1, 1980, date that the Systems Partnership was started.) By December 27, 1982, respondent had selected the Systems *542 Partnership's 1981 information return for examination. The examination subsequently was expanded to include the 1980 year. On March 22, 1983, Rietz notified the limited partners that there was no gain or loss reportable for the Systems Partnership for 1982. In his letter to the limited partners, Rietz explains that depreciation "is limited to the 'at risk rules' whereby you are limited in the amount you may deduct by your cash investment. You should have previously taken a deduction for depreciation in the amount of your cash invested." In a meeting held on March 28, 1983, with the Internal Revenue agent examining the Systems Partnership's 1981 information return, Rietz told the agent that in late January or February 1981 Rietz learned that Computer Supermarket had gone bankrupt. As of the date of the meeting, the Systems Partnership had not selected a new company to market the Computer Software. According to Rietz, the Computer Software is obsolete and is being rewritten for different hardware. On February 16, 1984, in a letter to the limited partners, Rietz informed the limited partners that -- We are in the process of preparing the Income Tax at this time and hope to have the *543 K-1 to you by March 1, 1984. So that you can go ahead and do your taxes I want to report to you that there was no activity in the Partnership whatsoever in 1983, and therefor [sic] the taxable income and losses for the year as reported to [sic] the Partnership, and you can enter that number into your tax return at this time. Briefly the progress of the Partnership in 1983 has been to research the changes that can be made to the software program to bring it up to date with the latest computer technology. It is our plans [sic] to obtain additional funds for the partnership by either borrowing or through equity contributions where we can proceed to market the software in the original manner after the changes are made. * * * The Computer Software was not offered to the market in 1980, 1981, 1982, or 1983. The Systems Partnership had no income in 1980, 1981, 1982, or 1983. No copies of the master diskette were made in 1980, 1981, 1982, or 1983. On their 1980 tax return, petitioners claimed a net loss of $ 2,121.40 from the Systems Partnership. The net loss represents Golden's distributive share of the Systems Partnership net operating loss resulting from depreciation claimed for the *544 Computer Software as outlined in Rietz's letter of March 14, 1981. In addition to the net loss from the Systems Partnership, on their 1980 tax return petitioners claimed an investment credit of $ 6,717.95 relating to the Computer Software. On their 1980 tax return, petitioners claimed a basis in the Computer Software for purposes of computing the investment credit of $ 89,100 and a tentative investment credit of $ 8,910. They claimed only $ 6,717.95 of the investment credit for 1980 because the amount of the investment credit allowable for that year was limited to the tax liability for that year. * * * The nonrecourse, promissory note was too contingent and speculative to be included in the basis of the Computer Software. The Systems Partnership did not enter into a trade or business with an actual and honest objective of making a profit. OPINION As preliminary matter, we note that respondent's determinations as to matters of fact in the notice of deficiency are presumed to be correct, and petitioners have the burden of proving otherwise. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). [9] However, respondent has the burden of proof with respect to the increased interest rate *545 under section 6621(c), which was asserted by amendment to his answer. Zirker v. Commissioner, 87 T.C. 970, 981 (1986); Reiff v. Commissioner, 77 T.C. 1169, 1173 (1981); Rule 142(a). I. Depreciation and Investment Credit
Respondent maintains that petitioners are not entitled to claim a deduction for Golden's distributive share of the Systems Partnership's net loss or investment credit on the Computer Software for one or more of the following reasons: (1) the Systems Partnership did not enter the computer software business with the objective of making a profit; (2) the Systems Partnership was not engaged in a trade or business as of December 31, 1980; and (3) the Computer Software was not "placed in service" as of December 31, 1980. Respondent also maintains in the alternative that, (a) because of the contingent nature of the promissory note, the nonrecourse note should not be included in the basis of the Computer Software for purposes of determining the depreciation deduction and investment tax credit, and (b) petitioners are not entitled to claim additional first-year depreciation *546 under section 179(a) for the following reasons: (1) the election to claim the additional first-year depreciation must be made at the partnership level on a timely filed income tax return and the Systems Partnership did not file an information return for 1980 and did not make the election on the 1981 information return; (2) the election cannot be made by raising an untimely claim for the additional first-year depreciation in the petition; (3) the Computer Software was not used in a trade or business or placed in service in 1980, and so the Computer Software does not qualify as section 179 property; and (4) the Computer Software was intangible personal property, and so it does not qualify as section 179 property. Petitioners contend that the Computer Software was placed in service in 1980, is depreciable property, is tangible personal property, is new section 38 property, and is qualified section 179 property. Petitioners also contend that the basis of the Computer Software includes the cash and the nonrecourse promissory note. Petitioners further maintain that the Systems Partnership was actively engaged in a business to make a profit and was engaged in business during 1980. We agree *547 with respondent's first contention. A deduction is allowable for depreciation only with respect to property used in a trade or business or for the production of income (sec. 167(a)).[10] *548 Also, an investment credit is allowable with respect to tangible personal property, but only if depreciation is allowable with respect to that property (sec. 48(a)(1)). [11] Before petitioners may be allowed Golden's distributive share of the Systems Partnership's operating loss and investment credit, they must prove that the activity in question constituted a trade or business. [12]Taube v. Commissioner, 88 T.C. 464, 478 (1987); Beck v. Commissioner, 85 T.C. 557, 569 (1985). To prove that the activity constituted a trade or business, petitioners must show that the activity was undertaken with an actual *549 and honest objective of making a profit. Resolution of this issue must be determined at the partnership level. While a reasonable expectation of profit is not required, a bona fide objective of making a profit must exist. Profit for this purpose means economic profit, independent of tax savings. Taube v. Commissioner, 88 T.C. at 478-479, and cases there cited; Beck v. Commissioner, 85 T.C. at 569-570, and cases there cited. In determining whether the Systems Partnership engaged in the activity for profit, all of the facts and circumstances with respect to the activity are to be taken into account. The burden of proving the objective to make a profit is on petitioners. While no one factor is determinative, greater weight is given to the objective facts than to the parties' mere statement of their intent. Brannen v. Commissioner, 78 T.C. 471, 506 (1982), and cases there cited, affd. 722 F.2d 695 (CA11 1984). Since profit objective is determined at the partnership level, our focus must be "on the intent of the general partner and the promoters of [the Systems Partnership] since it is these individuals who actually controlled the partnership's activities." Fuchs v. Commissioner, 83 T.C. 79, 98 (1984). *550 See also Taube v. Commissioner, 88 T.C. at 480. Section 1.183-2(b), Income Tax Regs., lists nine nonexclusive factors which normally are taken into account in determining whether an activity was "engaged in for profit". [13] *551 These factors are as follows: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. We do not reach our conclusions by merely counting the enumerated factors that support each party's position, but rather we evaluate all the facts and circumstances in the case taken as a whole. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. without published opinion 607 F.2d 995 (CA2 1979), affd. on another issue 615 F.2d 578 (CA2 1980). Based on this record, we are convinced that the Systems Partnership did not have the requisite profit objective. The Systems Partnership did not obtain any independent appraisal of the fair market value of the Computer Software even though the tax opinion letter warns that "the amount of the credit in relation to the amount actually invested by the partners is almost certain to result in an audit by the [Internal Revenue] Service." The parties have stipulated that Rietz, Castle, and Maynard determined the value of the Computer Software. Neither Rietz, Castle, nor Maynard testified at the trial. *552 As a result, we were denied the opportunity to judge the credibility of these men. No expert witnesses testified at the trial. [14] Negotiations for the purchase of the Computer Software, the terms of the maintenance contract, and the terms of the marketing agreement were not conducted at arm's length. The Systems Partnership, through Rietz or Castle, assertedly negotiated with Maynard for the purchase of the Computer Software. Rietz (through his company, the Management Partnership) received a commission from Maynard for the purchase of the Computer Software by the Systems Partnership. Thus, both Maynard and Rietz had an interest in placing a high price on the Computer Software regardless of its fair market value. Purportedly, the purchase price of the Computer Software was determined on the basis of the projected income from sales of the Computer *553 Software to school districts. According to the Summary, Computer Supermarket conducted a market study to determine the size of the market, competition, existing technology, market potential, market breakdown, market statistics, etc. However, the study, if in fact conducted, was not included in the promotional materials or presented at the trial. There is no independent support in the record for the income projections contained in the promotional materials. The Summary projected 68 sales in the first 3 years, to produce royalties of $ 1,441,600 in that time. (See table 1, supra.) The parties have stipulated that the Systems Partnership had no income in 1980-1983 and that the Computer Software was not even offered to the market during these years. The record in the instant case does not indicate any explanation (such as unexpected changes in the market) of this total failure. Under these circumstances, we conclude that it is more likely than not that the income projections were unreasonable when they were made and did not have any foundation in any meaningful study. (We consider later events when they help to illuminate the objective with which the Systems Partnership (and the *554 third parties on whom it relied, Flowers v. Commissioner, 80 T.C. 914, 932 (1983)) acted. Taube v. Commissioner, 88 T.C. at 482.) The record does not contain any persuasive evidence from which we can independently arrive at the Computer Software's fair market value. [15] Based on this record, however, we conclude that the fair market value of the Computer Software was not more than the $ 270,000 cash which the Systems Partnership paid to Maynard. Of the $ 5,400,000 that the Systems Partnership agreed to pay for the Computer Software, $ 5,130,000 (95 percent) was in the form of a nonrecourse note. The Computer Software, from this record, appears to be a speculative asset with an undeterminable value at the time of purchase. Payments *555 on the $ 5,130,000 nonrecourse note were to be made solely from a percentage of revenues from sales of the Computer Software. The only collateral for the note was the software itself. The market for the Computer Software was new and relatively untested. Thus, there was no security of any real economic value given to Maynard to support the $ 5,130,000 nonrecourse, promissory ntoe. If marketing the Computer Software failed (as it promptly did), then the note and interest would never be paid. We have not been shown that the note was other than worthless from its inception. We conclude from the above that the nonrecourse note was too contingent and speculative to permit its inclusion in the basis of the Computer Software. See Fox v. Commissioner, 80 T.C. 972, 1019-1022 (1983), and cases cited therein, affd. by order (CA2, Jan. 23, 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (CA4 1984), affd. in unpublished orders sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6, 7, 9 (CA3 1984). The Systems Partnership entered into an exclusive marketing agreement with Computer Supermarket *556 on December 31, 1980, to market the Computer Software. Apparently, Computer Supermarket went bankrupt within the next month or two. The record does not include evidence to suggest that the Systems Partnership made any effort to contract with a new marketing company after that time. Moreover, it does not appear that the Systems Partnership made any effort itself at any time to market the Computer Software. The Systems Partnership had no income and the record does not contain any persuasive evidence that it made an effort to generate any income. As far as we can determine, the Systems Partnership's only activity was to take in money from the limited partners and disburse those funds to Maynard, Castle, and Rietz. Indeed, the record in the instant case is consistent with a conclusion that the true purpose of the Systems Partnership was to generate tax benefits for the limited partners and income for Rietz, Castle, and Maynard, not to earn income from sales of the Computer Software. According to Rietz's letter of March 17, 1981, Castle withdrew administrative fees from the Systems Partnership ahead of schedule for personal expenses and refused to return them. Yet, the record does *557 not include any evidence that the Systems Partnership made any attempt to secure repayment of these funds. According to the record, at some point after 1980 the Computer Software became obsolete. The record does not include evidence that the Systems Partnership enforced, or attempted to enforce, the warranties in the Purchase Agreement or the terms of the maintenance agreement requiring Maynard Programming to keep the Computer Software from becoming obsolete. Moreover, it does not appear that the Systems Partnership made any effort to make the Computer Software marketable. We concluded earlier that the nonrecourse note was too contingent and speculative to be included in the basis of the Computer Software. In Flowers v. Commissioner, 80 T.C. at 937, we stated the following: If the principal amount of the nonrecourse note unreasonably exceeds the value of the property acquired, the note does not constitute "genuine indebtedness" and therefore is not included in the purchaser's basis of the property. Odend'hal v. Commissioner, 80 T.C. 588, 604 (1983) [, affd. 748 F.2d 908 (CA4 1984)]. However, a purchase price that is grossly inflated by means of nonrecourse indebtedness also raises *558 serious questions about the motives of the acquiring parties. Where there is a small cash downpayment and the remainder of the acquisition price is satisfied with nonrecourse indebtedness that is not supported by the fair market value of the property acquired, the possibility exists that the acquisition was undertaken to generate tax benefits. Thus, where other factors are present, the existence of a highly inflated nonrecourse note can contribute to the finding that the activity with respect to which the property was acquired was not entered into for profit. It is the presence of the nonrecourse indebtedness that creates the potential for shenanigans, and where it is found that a transaction lacked economic motivation but rather was undertaken primarily to reduce taxes by generating deductions and credits attributable to an inflated basis derived predominately from nonrecourse indebtedness, such indebtedness is not merely self-destructive, but can taint the entire transaction. [Fn. ref. omitted.] In the instant case, the nonrecourse note unquestionably taints the entire transaction. Ninety-five percent of the total $ 5,400,000 purchase price for the Computer Software was financed *559 through a nonrecourse promissory note. Petitioners have failed totally to establish the fair market value of the Computer Software. As far as we can tell, the sole purpose for the nonrecourse indebtedness was to generate tax deductions and credits. We have considered the other arguments raised by petitioners but find them unpersuasive. Based on the record as a whole, we conclude, and we have found, that the Systems Partnership did not enter into a trade or business with an actual and honest objective of making a profit. Consequently, the Systems Partnership may not claim depreciation or investment credit on the Computer Software. It follows that petitioners are not entitled to claim a depreciation deduction or an investment credit on the Computer Software. Since we have determined that the Systems Partnership did not enter into a trade or business with an actual and honest objective of making a profit, we need not address the other contentions raised by the parties as to the depreciation deduction or the investment credit. However, as to whether the Computer Software is tangible personal property for purposes of the investment credit, see Ronnen v. Commissioner, 90 T.C. 74, 96-100 (1988). *560 Petitioners further contend that the notice of deficiency "unconditionally allows the petitioners an out-of-pocket contribution deduction as an alternative to disallowing the depreciation deduction" of $ 2,121.40. Petitioners' position is based on the following language in the explanation of adjustments accompanying the notice of deficiency: 1) You have failed to establish that any ordinary and necessary expenses were paid or incurred during the taxable year 1980 in carrying on any trade or business; 2) You have failed to establish the depreciation deductions claimed represented a reasonalbe [sic] allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) of property used in a trade or business, or of property held for the production of income; Alternatively, the amount of your distributable share of the partnership loss that is allowable (in total for all years) is limited to your out-of-pocket contribution because that is your adjusted basis of your interest in the alleged partnership and you are not at risk with the [sic] respect to any greater amount; * * * We agree with respondent that the quoted language, in the context of this case, was *561 merely an alternative position in support of the disallowance of some or all of the claimed depreciation deduction and investment credit and not an open-ended offer to settle the case for Golden's out-of-pocket expenses. Since we have concluded that the Systems Partnership did not enter into a trade or business with an actual and honest objective of making a profit, the Systems Partnership is not entitled to claim depreciation or investment credit on the Computer Software. As a result, there is no distributive share of any loss or investment credit to be taken by petitioners. Consequently, there is no need for us to consider whether Golden's distributable share of the Systems Partnership loss or investment credit is limited to his out-of-pocket contribution. We hold for respondent on this issue. II. Section 6621(c)
Respondent contends that all of petitioners' deficiency is a substantial underpayment attributable to a tax motivated transaction, specifically a valuation overstatement. As a result, respondent maintains, petitioners are liable for increased interest under section 6621(c). Petitioners contend that they are entitled to the claimed depreciation deduction and investment *562 credit, and so there is no substantial underpayment and no increased interest rate. Alternatively, they state that "since the code cited by the respondent was issued in 1984, it should not be applied to the 1980 case in question." Finally, they maintain that respondent raised the issue too late in the proceedings. We agree largely with respondent. Section 6621(c)[16] *563 provides that, if a substantial underpayment is attributable to a tax motivated transaction, then the interest rate on that underpayment is 120 percent of the regular underpayment interest rate. The additional interest accrues after December 31, 1984, even though the disputed deficiency is for a year before the enactment of section 6621(c). Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (CA2 1986). The provision specifies what categories of *564 transactions are tax motivated transactions. One such category (sec. 6621(c)(3)(A)(i)) is a valuation overstatement, within the meaning of section 6659(c). [17] *565 The depreciation deduction and investment credit that petitioners took result from the Systems Partnership's claim of $ 5,400,000 cost basis for the Computer Software. Ninety-five percent of this basis results from the inclusion of the $ 5,130,000 nonrecourse note. The correct amount of the basis of the Computer Software is no more than $ 270,000, the cash that the Systems Partnership paid. Golden held a 1.65-percent interest in the Systems Partnership. On their 1980 tax return, petitioners showed a basis of $ 89,100 in the Computer Software, 1.65 percent of the Systems Partnership's claimed $ 5,400,000 basis. As a result, the basis that petitioners claimed on their 1980 tax return is at least 2,000 percent of the correct basis. It follows that there is a valuation overstatement within the meaning of section 6659(c). It follows from that that petitioners have an underpayment attributable to a tax motivated transaction; *566 it clearly appears that the amount of the underpayment so attributable exceeds $ 1,000; and so petiioners are liable for the additional rate of interest under section 6621(c) on the portion of the underpayment attributable to the valuation overstatement. Petitioners, relying on Law v. Commissioner, 84 T.C. 985 (1985), contend they would be prejudiced if we allowed respondent to raise the section 6621(c) interest issue. We do not agree. Petitioners' reliance on Law is misplaced. In Law, we considered respondent's post-trial motion to amend his answer to assert the applicability of section 6621(c). Because respondent had asserted numerous alternative grounds as the basis for the deficiencies, not all of which were listed as "tax motivated transactions", we found that significant legal questions might be raised as to the application of section 6621(c). On that basis, we found that the taxpayer in Law would be prejudiced if respondent's motion was granted. In the instant case, respondent raised the section 6621(c) additional interest issue 6 weeks before the trial. We conclude that petitioners had fair opportunity at trial to present evidence on this issue and later, on brief, *567 to marshal the evidence in the record and research the underlying law on this issue. See Bailey v. Commissioner, 90 T.C. 558, 626-627 (1988). Petitioners have not shown how they would be prejudiced as they allege and we conclude there is no prejudice. In his brief, in discussing his claim for additional interest under section 6621(c), respondent asserts that all of the deficiency in this case constitutes a substantial underpayment attributable to a tax motivated transaction under section 6621(c). Yet, also in his brief, respondent specifically limits his allegations of a valuation overstatement to the contingent nature of the promissory note, expressly arguing that the Systems Partnership's basis in the Computer Software was not more than its cash investment of $ 270,000. [18] *568 Thus, respondent has made no claim for any additional interest under section 6621(c) beyond the portion of the underpayment attributable to the inclusion in basis of the promissory note. Under these facts, the additional interest under section 6621(c) must be limited to the amount for which respondent has made a claim. See sec. 6214(a); Zirker v. Commissioner, 87 T.C. at 981-982. On the deduction and credit issue, we held for respondent on the ground that the Systems Partnership did not enter into a trade or business with an actual and honest objective of making a profit. In the course of reaching this result, we concluded that the $ 5,130,000 nonrecourse note was too contingent and speculative to be included in the basis of the Computer Software and that this taints the entire transaction. Our analysis of the basis of the Computer Software is "inseparable" from our analysis of the deduction and credit issue. McCrary v. Commissioner, 92 T.C. 827, 859-860 (1989). We hold for respondent to the extent of that portion of the underpayment that results *569 from reducing the basis of the Computer Software from the claimed $ 5,400,000 to $ 270,000; to the extent of the remainder of the underpayment, we hold for petitioners. III. Section 179
Section 179(a) allows an additional depreciation deduction "for the first taxable year for which a deduction is allowable under section 167". Since petitioners are not entitled to depreciation deductions under section 167, they also are not entitled to additional depreciation under section 179. (Sec. 179 was revised by sec. 202(a) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 219. This amendment does not apply to the instant case. Sec. 209(a) of the 1981 Act, 95 Stat. at 226.) We hold for respondent on this issue. To take account of the foregoing, Decision will be entered under Rule 155. Footnotes
1. Respondent's amendment to answer refers to section 6621(d). This section was redesignated as section 6621(c) by section 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744. For simplicity, we will hereinafter refer to this section as section 6621(c). Unless indicated otherwise, all section references are to the Internal Revenue Code of 1954 as in effect for the year in issue; references to section 6621↩ are to that section of the Internal Revenue Code of 1954 and 1986 as in effect for periods after December 31, 1984.
*. Under the promissory note, for years 3 through 9, the minimum payment would be $ 461,700 and the maximum payment would be $ 779,966.↩
2. The Purchase Agreement entered into on December 31, 1980, appears to be identical to Exhibit B attached to the December 18, 1980, private placement memorandum, except that (1) the two December 31, 1980, deadlines on the later document had been changed by hand from December 15, 1980, on the earlier document and (2) the name of the purchaser, "United States School Systems, Ltd.", was changed by crossing out "States".↩
3. The promissory note executed on December 31, 1980, appears to be identical to Exhibit D attached to the December 18, 1980, private placement memorandum, except that "United School Systems, Ltd." (the Systems Partnership), as obligor on the later document had been changed by hand from "Professional Software Marketing, Ltd." (Professional Software) on the earlier document. Castle was general partner of both of these partnerships. ↩
4. The Purchase Agreement's terms of payment of the $ 5,130,000 do not specify any payments during the first 2 years of the 10-year repayment period, or the payment of 90 percent of gross monthly revenues in each month during any year.
5. The maintenance agreement entered into on December 31, 1980, appears to be identical to Exhibit G attached to the December 18, 1980, private placement memorandum.↩
6. The marketing agreement entered into on December 31, 1980, appears to be identical to Exhibit E attached to the December 18, 1980, private placement memorandum.↩
7. The parties have stipulated that this application was approved on October 15, 1981. The stipulated exhibit shows that the extension of time (both requested and granted) was until↩ October 15, 1981, and the approval was dated August 27, 1981. Our findings are in accordance with the stipulated exhibit, rather than the parties' stipulation.
8. So stipulated. The stipulated copy of the information return shows that it was received at respondent's Fresno, California, service center on April 16, 1982. This suggests that the legal filing date of the information return probably was not later than April 15, 1982. (See secs. 7502(a), 6072(a), and 6031(a).) This probable discrepancy does not affect the instant case.↩
9. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.↩
10. SEC. 167. DEPRECIATION. (a) General Rule. -- There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) -- (1) of property used in the trade or business, or (2) of property held for the production of income. [The subsequent amendments of this provision (by sec. 203(a) of the Economic Recovery Tax Act of 1981 (Pub. L. 97-34, 95 Stat. 172, 221) and sec. 1002(a)(24) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647, 102 Stat. 3342, 3356)) do not affect the instant case.] 11. Section 48(a) (1) provides, in pertinent part, as follows: SEC. 48. DEFINITIONS; SPECIAL RULES. (a) Section 38 Property. -- (1) In general. -- Except as provided in this subsection, the term "section 38 property" means -- (A) tangible personal property, * * * * * * Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. * * * [The subsequent amendments of this provision (by sec. 211(e)(4) of the Economic Recovery Tax Act of 1981 (Pub. L. 97-34, 95 Stat. 172, 229) and sec. 1002(a)(29) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647, 102 Stat. 3342, 3357) do not affect the instant case.] ↩
12. Petitioners have not argued that the depreciation or the investment credit would be allowable under section 212 on the theory that the Computer Software was held by the Systems Partnership for the production of income.↩
13. Although section 183 technically does not come into play until after it has been determined that the activity in question was not being carried on for a profit within the meaning of section 162, this Court has relied on the nine factors set forth in section 1.183-2(b), Income Tax Regs., in making the requisite profit objective analysis under section 162. See, e.g., Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 727 (CA9 1986), affg. T.C. Memo. 1984-472; Brannen v. Commissioner, 78 T.C. 471, 507 (1982), and cases there cited, affd. 722 F.2d 695, 704↩ (CA11 1984).
14. In the instant case, we are hampered in our analysis of profit objective by an inadequate record. Since petitioners have the burden of proof on the profit objective issue, to the extent that the record is insufficient, they must suffer the consequences of the inadequacy of proof. Petzoldt v. Commissioner, 92 T.C. 661, 687↩ n. 21 (1989).
15. Indeed, from this record, we cannot say with confidence that the Computer Software even existed. Since respondent does not challenge the existence of the Computer Software (he does not concede, however, that the Computer Software programming was completed by the end of 1980), we will assume that the Computer Software existed at some time. We cannot conclude from this record, however, that the completed Computer Software program existed on December 31, 1980.↩
16. Section 6621 provides, in pertinent part, as follows: SEC. 6621. DETERMINATION OF RATE OF INTEREST. * * * (c) Interest of Substantial Underpayments Attributable to Tax Motivated Transactions. -- (1) In general. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the rate of interest established under this section shall be 120 percent of the underpayment rate established under this section. (2) Substantial underpayment attributable to tax, motivated transactions. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount the underpayment for such year so attributable exceeds $ 1,000. (3) Tax motivated transactions. -- (A) In general. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)), * * * (4) Jurisdiction of Tax Court. -- In the case of any proceeding in the Tax Court for redetermination of a deficiency, the Tax Court shall also have jurisdiction to determine the portion (if any) or such deficiency which is a substantial underpayment attributable to tax motivated transactions. [This text takes into account amendments made by sec. 1511(c)(1) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744.]↩
17. Section 6659 (as amended by sec. 155(c)(1)(A) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 693-694, and sec. 107(a) of the Technical Corrections Act of 1982, Pub. L. 97-448, 96 Stat. 2365, 2391) provides in pertinent part as follows: SEC. 6659. ADDITION TO TAX IN THE CASE OF VALUATION OVERSTATEMENTS FOR PURPOSES OF THE INCOME TAX. * * * (c) Valuation Overstatement Defined. -- For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). (d) Underpayment Must Be at Least $ 1,000. -- This section shall not apply if the underpayment for the taxable year attributable to valuation overstatements is less than $ 1,000. (e) Authority to Waive. -- The Secretary may waive all or any part of the addition to the tax provided by this section on a showing by the taxpayer that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith. * * * (g) Other Definitions. -- For purposes of this section -- (1) Underpayment. -- The term "underpayment" has the meaning given to such term by section 6653(c)(1).↩
18. Although from this record we cannot say with conviction that the Computer Software even existed in 1980, respondent has not challenged this point, see n.15, supra. Respondent has the burden of proof on the section 6621(c)↩ additional interest issue but has failed to present evidence from which we could establish a lesser fair market value for the Computer Software. Respondent presented sufficient evidence, however, to convince us that the promissory note is too contingent or speculative to be included in the basis of the Computer Software.